**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN AND JANE DOE,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | Civil Action No. _____ |
| | : | |
| **ROBERT F. KENNEDY, JR., in** | : | |
| **his official capacity as Secretary** | : | |
| **of the U.S. Department of Health** | : | |
| **and Human Services,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**COMPLAINT**
**FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiffs'[1] 7-year-old child, Child Doe, is severely ill. She suffers from end-stage heart disease and renal failure. She needs both a transplanted heart and kidneys to live but of the two the heart is the more pressing need.

2.      On January 7, 2026, Child Doe was admitted to the Children's Hospital of Philadelphia ("CHOP") because of collateral bleeding in her airway. This has recurred three times since then, and she has gone into cardiac arrest twice as a result.

---

[1]      John and Jane Doe, husband and wife, are pseudonyms being used herein by the Plaintiffs because they wish to protect their 7-year-old child, for whom the pseudonym Child Doe will be used, from the adverse effect of public disclosure of her identity and medical circumstances. A Motion to Allow Plaintiffs to Proceed Under Pseudonyms will be filed immediately after this complaint is filed. References to John and Jane Doe's names, as well as Child Doe's name and identifying information, have been redacted from the exhibits attached to this complaint.

On February 19, 2026, her doctors told her parents she should be taken home for palliative care and hospice (i.e., to die). But then she recovered and is now stable. However, the underlying condition that caused bleeding in her airway (a leaky, defective heart) is unchanged. Until she gets a transplant, she will be at risk of bleeding in her airway, which is likely to cause her death, as it almost did twice already this year. The bleeding is likely to recur, possibly within days, but the doctors cannot predict when.

3.      Child Doe is waiting to receive transplanted heart and kidneys through the federal Organ Procurement and Transplantation Network ("OPTN"), an organization authorized by the National Organ Transplant Act of 1984, as amended, et seq. ("NOTA"). Under NOTA, the OPTN must maintain a list of transplant candidates and implement a system for allocating donated organs. *Id.* § 274(b). The United States Department of Health and Human Services ("HHS") oversees the OPTN in accordance with a Final Rule promulgated by HHS in 2000 that is codified at 42 C.F.R. Part 121.

4.      Critically, under NOTA and the Final Rule, the OPTN must allocate organs "equitably" with "priority rankings" for organ transplant waiting lists to be "ordered from most to least medically urgent." 42 C.F.R. § 121.8(b)(2).

5.      Child Doe is classified as Status 1A for a heart transplant, which is the highest ranking, but within Status 1A patients are ranked by time waiting in Status 1A, not by medical urgency.

2

6. Under the OPTN system, for any patient to accrue time waiting in Status 1A the patient must be classified as Status 1A. Status 1A is only available to patients who are currently hospitalized or on a ventricular assisted device ("VAD").

7. In 2025, the CHOP care team suggested that Child Doe could be hospitalized, but John and Jane Doe declined because they had been caring for her at home with the heart and kidney problems since 2021, including administering dialysis, and did not appreciate that Child Doe was required to be hospitalized to accrue time waiting in Status 1A. Had they admitted her to CHOP in 2025, Child Doe would have accrued significantly more time waiting in Status 1A.

8. Child Doe was not classified as Status 1A until she was admitted to CHOP on an emergency basis for airway bleeding on January 7, 2026. Since then, she has been classified Status 1A for most but not all the time. She was taken off Status 1A twice for a period of several days because she was too sick to receive a transplant; during time off Status 1A she did not accrue waiting time in Status 1A.

9. It is highly likely if not certain that there are other pediatric patients higher on the Status 1A waiting list than Child Doe who will receive a transplanted heart before Child Doe and that some of these other patients either already are using or can use a VAD to sustain their life. Child Doe, because of her unusual medical condition including renal failure, is not a candidate for a VAD at this time. Given the likelihood that Child Doe will experience airway bleeding again soon, it is highly likely that Child Doe will die waiting for a heart while hearts are made available to other pediatric patients who could wait because they can use a VAD. In other words,

3

Child Doe is standing in line for a heart behind other patients whose need is not as medically urgent, despite the command of the NOTA and the Final Rule that organs be allocated by medical urgency.

10. As sympathetic as Child Doe's parents are for the needs of all patients, they recognize that under the NOTA and the Final Rule Child Doe has a right to be treated fairly in organ allocation, meaning specifically that she is required to wait in line for an organ but the line must be based on medical urgency; right now the line is not based on medical urgency. Stated in constitutional terms, Child Doe is at great risk of being deprived of her life while the federal system fails to follow the process mandated by the statute and regulations. If Child Doe dies, that will represent a deprivation of life without due process of law having been followed.

11. The Defendant Secretary of Health and Human Services has the authority under the NOTA and 42 C.F.R. § 121.4 to prevent malfunctioning of the OPTN system. Before filing this action, Plaintiffs sought relief by letter dated March 27, 2026, through the United Network for Organ Sharing, which runs the OPTN system, then through the OPTN itself and the Health Resources and Services Administration ("HRSA"), an agency of HHS, and then through the Defendant Secretary by letters dated April 21, 27, and 30, copies of which are attached as Exhibits A-C.

12. On May 1, 2026, the same day as the filing of this complaint, HRSA responded to the letters of March 27 and April 21, 27, and 30 by advising that it had asked the OPTN to provide answers to a list of questions implicated by the Plaintiffs'

4

requests under 42 C.F.R. § 121.4 and to do so by May 22, 2026. See Exhibit H. While this development is positive, it does not address the immediate concern that Child Doe could experience a life-threatening medical emergency if the problem of bleeding in her airway recurs, as it could at any time. Therefore, undersigned counsel advised HHS of Plaintiffs' intent to file this action today but asked to confer with the OPTN about its views on the feasibility of immediate reordering Child Doe's place in the waiting list so that she is not waiting behind other patients who are less medically urgent.

13.    Given the possibility that Child Doe could experience a recurrence of bleeding in her airway at any time, which would likely result in death; the clarity of the federal command that organs be allocated by medical urgency; and the strong possibility if not certainty that Child Doe is waiting in line for a transplanted heart behind other patients whose need is not as medically urgent as her need, Plaintiffs bring this action under the Administrative Procedures Act, 5 U.S.C. § 702, seeking judicial review of the Secretary's decision not to address the evident malfunctioning of the OPTN system that is likely to result in the death of Child Doe.

14.    For relief, Plaintiffs seek a declaration that the OPTN policies violated the NOTA and the Final Rule to the extent that they require Child Doe to wait in line for a transplanted heart behind other patients whose need for a transplanted heart is less medically urgent than hers because they can use a VAD to sustain their lives and she cannot. They also seek immediate and permanent injunctive relief requiring the Secretary to direct the OPTN to ensure that Child Doe's place in the waiting list

5

is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant. As additional relief, they also seek to require the Secretary to direct the OPTN to permit Child Doe to be housed outside of the hospital without losing Status 1A, if deemed medically acceptable by her medical team at CHOP.

## PARTIES

15.    Plaintiffs are the parents of 7-year-old Child Doe, who is now a patient at CHOP hoping to receive a heart and kidney transplant that will save her life.

16.    Defendant Robert F. Kennedy Jr. is the Secretary of the United States Department of Health & Human Services ("HHS"), located at 200 Independence Ave., S.W., Room 120F, Washington D.C. 20201. Defendant Kennedy is sued in his official capacity.

## VENUE AND JURISDICTION

17.    This action arises under the National Organ Transplant Act, 42 U.S.C. § 274, *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

18.    Jurisdiction is present under 28 U.S.C. § 1331 because the "district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

19.    Jurisdiction is also present under the APA, which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1); authorizes a court to "set aside agency action, findings, and conclusions of law

found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," *id.* § 706(2); and provides a right to judicial review of "final agency action for which there is no other adequate remedy in a court," *id.* § 704.

20.     This Court has authority to issue a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

21.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

### The NOTA and the OPTN

22.     Section 274(a) of the NOTA provides that "[t]he Secretary shall provide for the continued operation of an Organ Procurement and Transplantation Network which meets the requirements of subsection (b)."

23.     Subsection (b)(2) provides that the OPTN "shall":

(A) establish in one location or through regional centers—

(i)     a national list of individuals who need organs; and

(ii)     a national system, through the use of computers and in accordance with established medical criteria, to match organs and individuals included in the list, especially individuals whose immune system makes it difficult for them to receive organs;

…

7

(D) assist organ procurement organizations in the nationwide distribution of organs **equitably** among transplant patients;

…

(M) **recognize the differences in health and in organ transplantation issues between children and adults throughout the system and adopt criteria, polices, and procedures that address the unique health care needs of children**;

….

42 U.S.C. § 274(b)(2) (emphasis added).

24. The regulations provide that OPTN shall be responsible for developing "Policies for the **equitable allocation** of cadaveric organs in accordance with § 121.8." 42 C.F.R. § 121.4(a)(1). (Emphasis added.)

25. Section 121.8(b)(2) calls for "[s]etting priority rankings expressed, to the extent possible, through objective and measurable medical criteria, for patients or categories of patients who are medically suitable candidates for transplantation to receive transplants. **These rankings shall be ordered from most to least medically urgent** (taking into account, in accordance with paragraph (a) of this section, and in particular in accordance with sound medical judgment, that life sustaining technology allows alternative approaches to setting priority ranking for patients). **There shall be a sufficient number of categories (if categories are used) to avoid grouping together patients with substantially different medical urgency** …." (Emphasis added.)

26. The OPTN is under the oversight of the Health Resources of Services Administration ("HRSA"), an agency of HHS. See https://www.hrsa.gov/about.

8

27.     The Final Rule recognizes that the Defendant Secretary of HHS has specific authority to review the manner in which the OPTN carries its duties under NOTA and the Final Rule and to direct the OPTN actions as needed to carry out its duties. Section 121.4 of the regulations provides as follows:

> (d) Any interested individual or entity may submit to the Secretary in writing critical comments related to the manner in which the OPTN is carrying out its duties or Secretarial policies regarding the OPTN. Any such comments shall include a statement of the basis for the comments. The Secretary will seek, as appropriate, the comments of the OPTN on the issues raised in the comments related to OPTN policies or practices. **Policies or practices that are the subject of critical comments remain in effect during the Secretary's review, unless the Secretary directs otherwise based on possible risk to the health of patients or to public safety.** The Secretary will consider the comments in light of the National Organ Transplant Act and the regulations under this part and may consult with the Advisory Committee on Organ Transplantation established under § 121.12. After this review, the Secretary may:
>
> > (1) Reject the comments;
> >
> > (2) Direct the OPTN to revise the policies or practices consistent with the Secretary's response to the comments; or
> >
> > (3) Take such other action as the Secretary determines appropriate.

(Emphasis added.)

**Child Doe's Medical History and Status in the OPTN System**

28.     Child Doe has been a patient at the Children's Hospital of Philadelphia ("CHOP") since 2021. During this time, she has suffered from congenital heart disease and has needed a heart transplant.

29.     She also suffers from renal failure and has needed a kidney transplant during this same time; she has been on dialysis since age two.

30.    She has been hospitalized at CHOP since January 7, 2026, when she was admitted because of airway bleeding from collaterals, which involves coughing up blood from the respiratory tract. She had three more episodes of severe airway bleeding and two cardiac arrests while at CHOP since January 7.

31.    She suffers from end-stage heart failure, which is fatal unless she receives a new heart. Her only potential option other than a heart transplant is a VAD but that option is not viable because a VAD can immediately contribute to and increase the risk of collateral bleeding.

32.    If Child Doe has another case of bleeding, it could be hard to resuscitate her, which means she would die; and even if it were possible to resuscitate her, that could impact her ability to survive transplant surgery. If it was determined that she likely would not survive transplant surgery, she would be ineligible to be a candidate for heart transplant surgery. As explained below, Child Doe was in this very predicament in late February of this year.

33.    There is a significant risk that Child Doe will have severe airway bleeding again because she has had four separate incidents of it this year, but how likely and when cannot be known with certainty.

34.    Under the OPTN system, Child Doe is currently listed as Status 1A for a heart transplant, which is the most urgent category. However, within Status 1A, patients are ranked by wait time in Status 1A and she has not accrued much time in Status 1A compared to other patients. As a result, she will wait an indefinite period, likely a year or more, before she receives a transplant. Given her recent history,

realistically she will not live that long and will die before she ever qualifies for a heart transplant.

35.    Prior to her hospitalization on January 7, Child Doe was in Status 1B and that time does not count for wait time in Status 1A under the OPTN system.

36.    The OPTN requires that a heart patient be in the hospital or be using a VAD and classified as Status 1A for the time waiting in Status 1A to count in the system.

37.    Prior to January 7, Child Doe suffered from end-stage heart failure but she was not in the hospital. For that reason, she was classified as Status 1B prior to January 7.

38.    The fact that Child Doe also suffers from renal failure, is on dialysis, and needs a kidney transplant did not affect her status for a heart transplant prior to January 7 and it has not affected her status since then either.

39.    Under the OPTN system, not even all time in the hospital counts as time in Status 1A for a new heart. The patient must not only be in the hospital suffering from end-stage heart failure, but their condition must not be so severe that they do not qualify as a candidate for a heart transplant. For example, according to her medical chart, Child Doe was listed as Status 1A on January 9 after being admitted on January 7 but then she began coughing up blood, went into cardiac arrest, and was intubated on January 21. She was taken off Status 1A on January 22 but then a blood clot was evacuated from the endotracheal tube on January 25, she was extubated on January 28, and she went back on Status 1A on January 29. Thereafter,

11

she coughed up blood on February 9 and 10 and went off Status 1A on February 11 with more coughing of blood on February 18, and intubation for cardiac catheterization on February 26. During that time, her parents were told by the medical team at CHOP that due to her condition she would not be a candidate for a heart/kidney transplant and that she could soon go home for hospice/palliative care (i.e., to die). This is shown on the pages of Child Doe's chart attached as Exhibit D at 2.

40.     But then her condition improved, she was extubated on February 28, and she was again classified as Status 1A on March 12. She has been stable since then and is still listed as Status 1A. However, as noted above, the risk of recurring bleeding in her airway and ensuing cardiac arrest with the risk of imminent death is unacceptably high.

41.     On April 30, 2026, at 5 pm, Dr. Matthew J. O'Connor, the pediatric cardiologist caring for Child Doe, made the following entry in her medical chart:

> I met with [Child Doe's] mother at her request this afternoon to review [Child Doe's] care and anticipated trajectory. [Child Doe] remains hospitalized as she awaits heart-kidney transplantation under a status 1A exception on account of her complex single ventricle congenital heart disease, severe AV valve regurgitation, history of severe airway bleeding from AP collateral vessels, and end-stage kidney disease for which she has been on long-term peritoneal dialysis. We have limited options to improve her physiology, which is a challenging combination of cyanosis, recent airway bleeding, severe AV valve regurgitation, and end-stage renal disease. In some patients with single ventricle congenital heart disease who cannot be palliated to a Fontan circulation who have ventricular dysfunction and/or AV valve regurgitation, placement of a ventricular assist device can be considered. While this is not absolutely contraindicated in [Child Doe], her dialysis dependence and history of bleeding greatly raise the risk and complexity of VAD implantation. We do not feel that the risk-benefit analysis favors a VAD at this time,

12

although a VAD could be considered if her heart failure symptomatology worsened and became unmanageable with medical therapy alone. However, our concern about placing a VAD at this time does not diminish her clear need for transplantation. She remains at high risk of life-threatening deterioration on account of her history of severe airway bleeding (which prompted the current admission) and for which she has had bleeding while admitted. Combined heart-kidney transplant is the only clear path she has to resolve these complex issues and be able to be discharged safely from the hospital. Mother asked for more information about urgency status categories for heart transplant. I explained that status 1A is intended to include patients who are in the most urgent need of transplant, although within status 1A there is variation in illness severity (as measured by waitlist mortality) given the heterogeneity of diagnoses and therapies that qualify for this status.

See Exhibit E.

### Plaintiff's Request to the OPTN, HRSA, and the Secretary

42.    On March 27, 2026, Plaintiffs through counsel wrote to the United Network for Organ Sharing ("UNOS"), which runs the OPTN under contract, raising their concerns about Child Doe's predicament and asking "to receive your thoughts and those of experts at UNOS about this specific inequity and what could be done to address it, consistent with the overall legal and ethical mandate that organs be allocated fairly and with due regard for medical urgency." See Exhibit F. With the letter Plaintiffs' counsel provided an Affidavit from Jane Doe, Child Doe's mother. That same day, UNOS responded that as a contractor for the OPTN it had no authority to take any action, and it referred Plaintiffs to the OPTN and HRSA.

43.    On March 28, 2026, Plaintiffs through counsel directed the same inquiry to the OPTN and HRSA.

44.    The OPTN responded to Plaintiffs by letter dated April 1, 2026, a copy of which is attached as Exhibit G. The letter advised that "[i]t appears that [Child

Doe's] current placement on the waitlist is consistent with the allocation policy." *Id*. at 1. The letter also offered to have a meeting of the clinical care team at CHOP "with OPTN personnel to discuss [Child Doe's] options and status." *Id*. at 2.

45.     Plaintiffs through counsel wrote to the OPTN on April 10, 2026, and requested the meeting suggested by the OPTN in the April 1 letter, but the OPTN responded on April 14, 2026, that OPTN personnel would only meet with and at the request of the with the CHOP clinical care team, which prompted Plaintiffs through counsel on April 15, 2026, to write the OPTN raising four questions:

- Is there any way under the existing policy that she can be credited with additional time in Status 1A, such as the time she was receiving dialysis at home before being admitted to CHOP and/or all of the time since being admitted at CHOP?
- If she gets listed at another hospital, how will that affect her time in Status 1A?
- Would it be possible for her to be outside of the hospital close to the emergency room to improve the quality of her life, which regrettably could be short, without removing her from Status 1A?
- Is there any way to gauge when she might receive a heart and kidneys under the current policy?

See Exhibit (a copy of the email correspondence) A at 29.

46.      On April 21, 2026, not yet having received a response from the OPTN to the questions raised on April 15, Plaintiffs through counsel wrote to the Defendant Secretary of HHS and asked him to conduct a review of the situation involving Child Doe:

> The requested review should specifically address whether [Child Doe's] placement on the waiting list is in accordance with a reasonable evaluation of the medical severity of her condition in relation to other patients, if not whether there is some compelling reason for not addressing the apparent failure to rank her by medical severity, and whether it would be appropriate (equitable) in accordance with the

14

principles that govern the OPTN's policies for her to be credited with time in Status 1A during the time she was at home before being hospitalized, listed as Status 1B, and undergoing dialysis on a daily basis, as well as all the time since she has been hospitalized since January 7.

See Exhibit A at 7.

47. The April 21 letter to the Secretary also asked the requested review "also consider whether there is any sound reason why [Child Doe] should not be allowed to live outside of the hospital but close by (so she can return quickly in an emergency) if she can receive dialysis and care outside and her doctors determine that there is no medical reason why she needs to be in the hospital, without losing time in Status 1A."

*Id.*

48. On April 22, 2026, the OPTN responded to the four questions asked by Plaintiffs on April 15. See Exhibit B at 46-47. The answer to the first, third, and fourth questions was, in essence, no. *Id.*

49. On April 27, 2026, Plaintiffs through counsel wrote a supplemental letter to the Secretary to provide additional context for the request. See Exhibit B.

> [Child Doe] is being treated unfairly because she is grouped with other pediatric patients for purposes of heart allocation and ranked within that group by waiting time based upon when she was hospitalized. Because of her medical condition, however, she is at imminent risk of collateral bleeding, which would likely cause her death. Further, unlike many other pediatric patients waiting for hearts, her condition cannot be treated with a ventricle assisted device ("VAD") because it would not address her specific medical needs and would exacerbate the risk of collateral bleeding.
>
> Because of these facts, [Child Doe's] parents are concerned that *she is lower on the waiting list than other pediatric patients who could wait longer than her for a heart (because they can utilize a VAD), and that as a result she is at serious risk of dying sooner than other patients who can*

15

*utilize a VAD and are higher on the waiting list for a heart.* The OPTN should be able to take a position on this subject, given its access to pediatric cariology experts and the data accessible only to it about the waiting lists. I therefore request that you determine the answer to this medical/factual question as part of your review requested under 42 C.F.R. § 121.4.

If your review determines that the italicized sentence above is substantially or likely correct, then there is a serious concern that [Child Doe's] current ranking violates the OPTN policy (42 CFR § 121(b)(2)) in at least two respects. First, this section provides that "rankings shall be ordered from most to least medically urgent (taking into account, in accordance with paragraph (a) of this section, and in particular in accordance with sound medical judgment, that life sustaining technology allows alternative approaches to setting priority ranking for patients)." If the italicized statement is correct, then [Child Doe] is more medically urgent than other patients on the waiting list who could use life sustaining technology, i.e., a VAD, that she cannot use. Second, this section also provides that "[t]here shall be a sufficient number of categories (if categories are used) to avoid grouping together patients with substantially different medical urgency." If the italicized statement is correct, then [Child Doe] is being grouped with other patients, i.e., ones who can use a VAD, with substantially different medical urgency. At the very least, there should be room under the system for an exception for special cases where a patient because of their unique circumstances is evidently in greater need of an organ based on relative medical urgency than other patients who are ranked higher on the waiting list.

*Id.* at 2-3.

50.    On April 30, 2026, Plaintiffs through counsel wrote a second supplemental letter to the Defendant Secretary of HHS that stated as follows:

As I explained in my prior letters, [Child Doe] presents a highly unusual case in the organ transplant system of a patient who is clearly more medically urgent and in need of a transplant than other patients ranked higher on the waiting list for a transplanted heart, and as a result she is likely to die waiting for a heart while other patients who could wait receive hearts. As sympathetic as her parents are for the needs of all patients, they recognize that under the National Organ Transplant Act of 1984, 42 U.S.C. § 274, et seq., and the Final Rule codified at 42 C.F.R. §§ 121.1-13, [Child Doe] has a right to be treated fairly in organ

16

allocation, meaning specifically that she is required to wait in line for an organ but the line must be based on medical urgency; right now the line is not based on medical urgency. Stated in constitutional terms, [Child Doe] is at great risk of being deprived of her life while the federal system fails to follow the process mandated by the statute and regulations. If [Child Doe] dies, that will represent a deprivation of life without due process of law having been followed.

My clients understand that you and your staff have many important pressing matters, but **their concern that their daughter could die if this situation is not addressed soon requires them to seek expedited resolution of their request for action** by you under 42 C.F.R. § 121.4. Accordingly, they have asked me to file an action in federal court under the Administrative Procedures Act seeking expedited injunctive relief requiring the OPTN to ensure that her place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant. I am preparing the complaint and plan to file it in the Eastern District of Pennsylvania no later than Monday, May 4, 2026, and sooner if possible.

Please feel free to contact me or have your counsel contact me to discuss any aspect of this request. I am grateful for your continued attention to this urgent matter.

Exhibit C at 1-2. (Emphasis added.)

51. On May 1, 2026, HHS/HRSA responded to the letters of March 27 and April 21, 27, and 30. See Exhibit H. Plaintiffs through their counsel responded as follows:

Thank you for your letter. That is a very informative and interesting development. However, my clients are very concerned that their daughter could experience a life-threatening medical emergency if the problem of bleeding in her airways recurs, as it could at any time. Therefore, we are planning on filing a federal lawsuit very soon, probably later today, and following up with a motion for immediate injunctive relief that we hope a federal judge will consider as soon as possible. The relief we seek will be for the Secretary to immediately require the OPTN to reorder the child's place in the waiting list so that she is not waiting behind other patients who are less medically urgent. One way to do this would be to credit her with time in Status 1A for all the time she has spent on dialysis. There may be other ways to

accomplish the same end. The OPTN would be in the best position to advise on how to do this, and we intend to ask the court to require the OPTN to provide information on this subject and confer with the parents through their lawyer on this subject. I tell you this so that you and your colleagues can confer with your client about this. I would be happy to discuss the subject with you as well.

See Exhibit I.

## CLAIMS FOR RELIEF

### COUNT I
### ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A)-(D)
### THE SECRETARY'S ACTION IS NOT IN ACCORDANCE WITH LAW

52.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-51 above.

53.     Under the APA, a court reviewing a final agency action must "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (D) without observance of procedure required by law." 5 U.S.C § 706(2)(A)-(D).

54.     The Secretary's decision not to require the OPTN to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant is not in accordance with law because under NOTA and the Final Rule the OPTN is required to allocate organs to the greatest extent practicable by medical urgency. Patients therefore have a right to expect that organs will be allocated equitably in accordance with this requirement. In the case of Child Doe, that right is being violated by the

18

system that makes her wait longer than other patients for arbitrary reasons. She presents as a very medically urgent case, more urgent than others who are ranked higher on the waiting list. She is likely to die waiting for a heart transplant while those ranked higher than her on the list, who could live without a transplant, because they could use a VAD, receive transplanted hearts.

**COUNT II**
**ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A)**
**THE SECRETARY'S ACTION IS**
**ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION**

55.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-54 above.

56.    The Secretary's decision not to require the OPTN to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant is arbitrary, capricious, and an abuse of discretion because the Secretary has no sound reason for leaving in place a policy that places her in line for a heart transplant behind other patients whose need is less medically urgent then her need, serves no valid purpose, affords no flexibility or exceptions in special cases or circumstances, and violates legal and regulatory requirements.

57.    The Secretary's decision not to require the OPTN to permit Child Doe to be housed outside of the hospital without losing Status 1A, if deemed medically acceptable by her medical team at CHOP, is arbitrary, capricious, and an abuse of discretion because the Secretary has no sound reason for requiring Child Doe to continue a long stay in the hospital, which is difficult for anyone but particularly

19

difficult for a child, if her doctors approve of her being housed outside the hospital, particularly someplace close by where she can be returned to the hospital quickly if needed, so that she can enjoy as much normalcy and comfort as possible, given the tragic reality that her time may be limited.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a temporary restraining order and preliminary and permanent orders requiring the Secretary to direct the OPTN (1) to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant, and (2) to permit Child Doe to be housed outside of the hospital without losing Status 1A, if deemed medically acceptable by her medical team at CHOP.

Respectfully submitted,

**STEVE HARVEY LAW LLC**

By:   /s/ Stephen G. Harvey
Stephen G. Harvey (PA 58233)
Michael E. Gehring (PA 57224)
E. Kelly Conway (PA 324626)
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
mike@steveharveylaw.com
kelly@steveharveylaw.com

Dated: May 1, 2026

20