IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN AND JANE DOE,<br><br>      Plaintiffs,<br><br>      v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>      Defendant. | Case No. 26-cv-02937 |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

ERIC S. WOLFISH
Assistant United States Attorney

*Counsel for Defendants*

## INTRODUCTION

Every child awaiting an organ transplant deserves equal treatment. Congress passed the National Organ Transplant Act (42 U.S.C. § 273 *et seq.*) to ensure the equitable allocation of vital organs according to policies and procedures established by medical experts at the Organ Procurement and Transplantation Network ("OPTN"). HHS recognizes that "demand for organs for transplantation exceeds the supply" and that "[h]uman organs that are given to save lives are a public resource and a public trust." 63 Fed. Reg. 16296, 16296, 16299 (1998).

The Child here awaits a heart transplant, along with many other similarly-situated children. Each child's place on the waiting list has been determined according to the OPTN's heart allocation policy. Plaintiffs ask the Court to disregard that policy and give the Child preferential treatment.

In particular, Plaintiffs ask the Court to order the Secretary to instruct the OPTN to reorder the Child's place on the status 1A (highest tier) waiting list and permit the Child to be housed outside of a hospital without losing status 1A. Plaintiffs seek to change the status quo through a mandatory injunction issued under the APA. There are *three* jurisdictional bars to Plaintiffs' requested relief, any one of which would mandate dismissal.

First, agency action that is "committed to agency discretion by law" is not reviewable under the APA. 5 U.S.C. § 701(a)(2). Under NOTA, the Secretary must receive "critical comments" concerning transplants, but the Secretary has broad

1

discretion on whether and how to instruct the OPTN in response to critical comments. There is neither a legal requirement nor express legal authority for the Secretary to order the OPTN to provide Plaintiffs' requested relief.

Second, a "final agency action" has not been rendered because, as Plaintiffs acknowledge, agency discussions on the critical comment letters Plaintiffs submitted to HHS have been expedited and are ongoing.

Third, a mandatory injunction is only available if an agency "failed to take a *discrete* ... action that it is *required* to take," and it is undisputed that the Secretary is not *required* to provide Plaintiffs' requested relief. *See* 5 U.S.C. § 706(1); *Massie v. U.S. Dep't of Housing & Urban Dev.*, 620 F.3d 340, 347 (3d Cir. 2010).

And, even if Plaintiffs could state a valid cause of action under the APA, which they surely cannot, Plaintiffs' request to substitute their judgment based on the subjective circumstances of the Child's condition in place of the OPTN's heart allocation policy, and to require the OPTN to provide special treatment to a single individual in conflict with NOTA's requirements for equitable allocation, is not likely to succeed. In short, the OPTN did not err in its application of the heart allocation policy to the Child.

The other preliminary injunction factors also favor the Secretary. Although Plaintiffs focus on the Child's risk of irreparable injury, this case is not about having empathy for the Child or sympathy for her parents – it is about the fundamental *inequity* of prioritizing the Child's life ahead of other sick children's

2

lives. Moving the Child up on the waiting list will move other children down. Indeed, if parents could sue HHS to gain their children a higher spot on the waiting list, then the allocation of organs would be the product of never-ending litigation favoring those that retain counsel. As a result, judges, and not the experts selected by Congress, would make medical judgments with life and death consequences. That impracticable, unethical outcome would be contrary to the law requiring organs to be distributed "equitably" using objective "medical criteria." *See* 42 U.S.C. § 274(b)(2)(A), (D).

Plaintiffs' request for a temporary restraining order and preliminary injunction should be denied.

## FACTS AND PROCEDURAL HISTORY

### I.     Legal Framework for Organ Allocation Policies

#### A.     National Organ Transplant Act of 1984 ("NOTA")

NOTA requires the Secretary of HHS to establish a national system to allocate donated organs and to "assist [Organ Procurement Organizations] in the *nationwide* distribution of organs *equitably* among transplant patients." 42 U.S.C. §§ 274(b)(2)(A)(ii); 274(b)(2)(D) (emphasis added). To accomplish these goals, NOTA tasked the Secretary with establishing and providing for the continued operation of an expert body, the OPTN, to set organ allocation policy and to distribute organs. *Id.* § 274(a).

The OPTN, which is not a defendant in this lawsuit, is not part of HHS, but is operated by award with HHS. *See* 42 U.S.C. §§ 274(a), (b)(1)(A). HHS has

3

statutory authority to ensure the "continued operation" of the OPTN and to consider

"critical comments" regarding the operations of the OPTN. *See* 42 U.S.C.

§ 274(a),(c). The OPTN Board of Directors, which is charged with setting organ

allocation policy, is comprised of a diverse cross-section of stakeholders and experts

in the field of organ transplantation, including representatives of organ

procurement organizations, "transplant centers, voluntary health associations, and

the general public." *Id.* § 274(b)(1)(B)(i).

### B.    OPTN Final Rule

HHS regulations implementing NOTA became effective on March 16, 2000.

*See* 42 C.F.R. pt. 121 ("OPTN Final Rule"). The regulations require the OPTN to

develop "[p]olicies for the equitable allocation of cadaveric organs in accordance

with [42 C.F.R. § 121.8]." 42 C.F.R. § 121.4(a)(1).

Congress sought to ensure that the transplant system be "operated by the

transplant community," 63 Fed. Reg. 16,296, 16,297–98 (Apr. 2, 1998), and, as a

result, HHS does not prescribe specific organ allocation policies. Instead, HHS

regulations provide a list of factors the OPTN Board must adhere to in developing

organ allocation policies. *See* 42 C.F.R. § 121.8(a).

### C.    Adoption of Organ Allocation Policies

The OPTN Final Rule mandates that any organ allocation policy meet eight

discrete requirements, including that policies "[s]hall be based on sound medical

judgment," "[s]hall seek to achieve the best use of donated organs," and "shall not be

based on a [transplant] candidate's place of residence," except as otherwise

4

necessitated by the regulation. 42 C.F.R. § 121.8(a).

Any OPTN policy under consideration by the OPTN Board of Directors may be adopted only after solicitation published on the OPTN website and consideration of public comments. 42 C.F.R. § 121.4(b)(1). The Secretary exercises oversight in the adoption of all OPTN policies by, among other things, including non-voting Health Resources and Services Administration ("HRSA") representatives on the OPTN Board, and by considering and responding to any "critical comments" submitted in response to OPTN policies. 42 U.S.C. § 274(c); 42 C.F.R. § 121.4(d).

## II.    The Current OPTN Heart Allocation Policy

### A.    Pediatric Status 1A and 1B

OPTN's current heart allocation policy was effective in February 2022. *See* Ex. 1, available at

https://www.hrsa.gov/sites/default/files/hrsa/optn/optn_policies.pdf. Section 6.2 concerns "Pediatric Status Assignments and Update Requirements" and classifies heart candidates less than 18 years old in one of four categories: (i) Pediatric status 1A; (ii) Pediatric status 1B; (iii) Pediatric status 2; and (iv) Inactive Status. *Id.* at 124. The highest tier, status 1A requires at least one of the following criteria:

1.    Requires continuous mechanical ventilation and is admitted to the hospital that registered the candidate.

2.    Requires assistance of an intra-aortic balloon pump and is admitted to the hospital that registered the candidate.

3.    Has ductal dependent pulmonary or systemic circulation, with ductal patency maintained by stent or prostaglandin infusion, and is admitted to the transplant hospital that registered the

5

candidate.

4.      Has a hemodynamically significant congenital heart disease diagnosis, requires infusion of multiple intravenous inotropes or a high dose of a single intravenous inotrope, and is admitted to the transplant hospital that registered the candidate. The OPTN maintains a list of OPTN-approved congenital heart disease diagnoses and qualifying inotropes and doses that qualify a candidate for pediatric status 1A.

5.      Requires assistance of a mechanical circulatory support device.[1]

*Id.* at 125. Pediatric status 1A is valid only for 14 days from the date of initial registration without recertification by the transplant program every 14 days to extend the 1A status. *Id.* Expiration of status 1A leads to assignment of status 1B. *Id.*

In turn, status 1B requires at least one of the following criteria:

1.      Requires infusion of one or more inotropic agents but does not qualify for pediatric status 1A. The OPTN maintains a list of the OPTN-approved status 1B inotropic agents and doses.

2.      Is less than one year old at the time of the candidate's initial registration and has a diagnosis of hypertrophic or restrictive cardiomyopathy.

*Id.* at 125-26. A candidate may retain status 1B for an unlimited period of time and recertification is unnecessary, unless the candidate's medical condition changes. *Id.* at 126.

## B.    Waiting Time and Sorting within Status Levels

A candidate's waiting time begins with registration as an active heart

---

[1] This is also known as a Ventricular Assist Device (VAD).

candidate on the waiting list and is calculated within each status. Ex. 1 at 130. If a candidate's status is upgraded, for example from status 1B to 1A, then the waiting time at a lower status is not transferred to a higher status. *Id.* On the other hand, waiting time accrued at a higher status is transferred to a lower status if the candidate is assigned a lower status. *Id.*

Under the policy, candidates are "sorted within each classification by the total amount of waiting time that the candidate has accumulated at that status." *Id.* at 132. However, the allocation of donor hearts follows complex charts with up to 104 classification levels based on: whether the donor was at least 18 years old; pediatric status; primary blood type match; and distance between the transplant hospital and donor hospital. *Id.* at 132-143.

### III.    The Critical Comment Process

Plaintiffs invoke the resolution of critical comments as the *only* relevant authority that the Secretary has over the Child's placement on the waitlist. NOTA requires the Secretary to establish procedures for "(1) receiving from interested persons critical comments relating to the manner in which the [OPTN] is carrying out the duties of the Network . . . and (2) the consideration by the Secretary of such critical comments." *See* 42 U.S.C. § 274(c); *see also* 42 C.F.R. § 121.4(d) (permitting interested parties to "submit to the Secretary in writing critical comments related to the manner in which the OPTN is carrying out its duties or Secretarial policies regarding the OPTN"). HHS regulations detail the procedure to be followed upon receipt of a critical comment. First, the Secretary may seek comments from OPTN

on the issues raised in light of NOTA and the applicable regulations and may also consult with the Advisory Committee on Organ Transplantation. *Id.* After this review, the Secretary has the discretion to:

1. Reject the comments;

2. Direct the OPTN to revise the policies or practices consistent with the Secretary's response to the comments; or

3. Take such other action as the Secretary determines appropriate.

*Id.* Notably, the Secretary is not required to issue Plaintiffs' requested relief, which would require the Secretary to order the OPTN to take patient-specific actions that directly conflict with current OPTN policy, including: revising the status of a particular patient on the waiting list for pediatric hearts; reordering the status 1A waiting list for a particular patient; or permitting a particular patient to be housed outside of a hospital without losing status 1A.

## IV.    This Lawsuit

Plaintiffs filed this case on May 1, 2026, seeking preliminary and permanent injunctive relief against the Secretary. Dkt. No. 1. Plaintiffs' causes of action both arise under the APA at 5 U.S.C. § 706(2), alleging that the Secretary's action was contrary to law and arbitrary and capricious. *Id.* at ¶¶ 52-57. Plaintiffs' request for a mandatory injunction, however, appears to arise under section 706(1), under which a court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## LEGAL STANDARD

"An injunction is a drastic and extraordinary remedy, which should not be

granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Instead, injunctions "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must establish that (1) "he is likely to succeed on the merits" of his claim; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) an injunction is in the public interest. *Id.* at 20.

"A movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *HAPCO v. City of Phila.*, 482 F. Supp. 3d 337, 348 (E.D. Pa. 2020) (cleaned up) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). The court considers the remaining two factors only if the first two factors are met. *Id.* at 348-49. But "[t]he failure to establish any element renders a preliminary injunction inappropriate." *Ferring Pharms, Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (cleaned up).

Where—as here—the movant seeks "a mandatory preliminary injunction that will alter the status quo," that party "bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). The Supreme Court has described a mandatory injunction as an "extraordinary remedy [to] be employed only in the most unusual case." *Communist*

*Party of Indiana v. Whitcomb*, 409 U.S. 1235, 1235 (1972).

With respect to Plaintiffs' APA claims, in considering whether an agency action is arbitrary and capricious, courts "focus[ ] … on the agency's process of reasoning." *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 190 (3d Cir. 2006). Courts ask "whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence." *Id.* A reversal is "appropriate only where the administrative action is irrational or not based on relevant factors." *Id.* Moreover, a reviewing court "must generally be at its *most deferential*" where an agency decision involves matters "at the frontiers of science[.]" *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### I.   Plaintiffs Have Not Shown a Likelihood of Success on the Merits

#### A.   Plaintiffs Cannot Establish Jurisdiction under the APA

##### 1.   Plaintiffs' requested relief is committed to agency discretion and not reviewable.

The APA's waiver of sovereign immunity in 5 U.S.C. § 702 does not apply (and courts thus lack jurisdiction over an APA claim) if the claim involves "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And the conduct challenged here—the Secretary's purported failure to instruct OPTN to revise Plaintiffs' status on the waiting list for a heart transplant—falls squarely

within § 701(a)(2)'s carve-out for discretionary action.

Section 701(a)(2) precludes review where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Section 701(a)(2) applies if judicial review would require the court to substitute its own judgment for the agency's judgment on matters committed to professional, managerial, or policy discretion, and where Congress has supplied no judicially manageable criteria. *Id.* at 830-32, 837-38; *see also Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (reaffirming *Heckler*'s "no meaningful standard").

The Supreme Court has "established a presumption against judicial review of agency decisions that involve whether to undertake investigative or enforcement actions." *Am. Disabled for Attendant Programs Today v. U.S. Dep't of Housing & Urban Dev.*, 170 F.3d 381, 384 (3d Cir 1999) (citing *Chaney*, 470 U.S. at 838). Noting that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," the Court stated that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Chaney*, 470 U.S. at 831–32.

The Supreme Court has also found agency action unreviewable where an agency exercised discretion over how best to advance broad statutory objectives. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (allocation of lump-sum appropriations was committed to agency discretion by law because it required a complicated

11

balancing of factors that were particularly within an agency's expertise, including proper ordering of its priorities); *see also Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (authorization for the U.S. Trade Representative to enter into agreements with foreign countries was committed to agency discretion in part because the negotiation and determination of international agreements "is a paradigmatic example of 'a complicated balancing of a number of factors which are peculiarly within the USTR's expertise'") (cleaned up).

The Third Circuit has further refined this standard and held that § 701(a)(2) applies if agency action (1) "involves broad discretion"; (2) "is the product of political or managerial choices that are not readily subject to judicial review"; and (3) does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.*, 454 F. App'x 118, 122 n.2 (3d Cir. 2011) (cleaned up) (quoting *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 203, 205 (3d Cir. 2003)).

Here, the statute provides the Secretary discretion to determine the agency's procedure for receiving and considering critical comments. *See* 42 U.S.C. § 274(c). The implementing regulation then states that the Secretary "may . . . take such other action as the Secretary determines appropriate" in response to critical comments. 42 C.F.R. § 121.4(d). In other words, the Secretary may choose whether to take any action at all and what form of action to take. The Secretary thus has broad discretion. The Secretary's choices are also not readily subject to judicial

12

review, because the critical comment process involves discussions between the Secretary, OPTN, and other transplants experts; it is not akin to a claim for benefits subject to administrative appeal. *Id.* Finally, Plaintiffs do not identify any constitutional, statutory, or regulatory command requiring the Secretary to provide the patient-specific relief they seek. Accordingly, the Secretary's choice not to grant Plaintiffs' requested relief is not subject to APA review.

### 2.    Plaintiffs concede that a final agency decision has not been rendered.

Review under the APA is further limited to "*final* agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). But Plaintiffs concede that agency discussions regarding the critical comment are ongoing (Compl. ¶ 12), and Plaintiffs cannot identify any final agency decision from which they seek review.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court articulated two necessary conditions for agency action to be final under the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 178 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (citations omitted). To satisfy the second condition, the agency's action generally must impose "obligations, prohibitions, or restrictions" or "give rise to . . . direct and appreciable legal consequences." *Chemours Co. FC, LLC v. United States Env't Prot. Agency*, 109

13

F.4th 179, 184 (3d Cir. 2024) (cleaned up).

The Complaint acknowledges that on May 1, 2026, HRSA responded to Plaintiffs' critical comment letter (dated March 27, April 21, and April 27, 2026) by asking the OPTN to "provide answers to a list of questions implicated by the Plaintiffs' requests under 42 C.F.R. § 121.4 and to do so by May 22, 2026." Compl. ¶ 12. No decisions have been made in Plaintiffs' case, and agency action regarding this critical comment is plainly ongoing. Accordingly, there has not been a consummation of the agency's decisionmaking process that could give rise to appeal.

Meanwhile, Plaintiffs assert that the failure of the Secretary to "grant immediate relief" constitutes final agency action. Dkt. No. 5 at 19. It is unreasonable, however, to expect federal agencies to decide every issue before them *immediately*. Instead, the APA and Supreme Court permit agencies to conduct a decisionmaking process and render a final decision *before* a plaintiff files suit. The OPTN, Secretary and HRSA have responded quickly to Plaintiffs on a highly complex issue with significant public policy implications. Indeed, the President of the Board of Directors of the OPTN responded on a Sunday to Plaintiffs' initial letter (sent two days earlier) and agreed to conduct an "expedited review." Compl. Ex. B. There has been extensive, continuous correspondence regarding the Child's situation since that time. *See* Compl. Ex. C [Dkt. No. 1-3], Ex. 2 [Dkt. No. 1-4], Ex. G [Dkt. No. 1-9], Ex. H [Dkt. No. 1-10]. This is certainly not a case of administrative

14

inaction that could justify short-circuiting the APA's finality requirement.[2]

### 3. The APA does not authorize Plaintiffs' mandatory injunction.

Even if there were jurisdiction under the APA, Plaintiffs cannot satisfy the requirements to compel agency action under section 706(1). The Supreme Court found that a claim under section 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64. In *Lujan*, the Court found that a land withdrawal review program was not "agency" action that could be "set aside" under section 706(2):

> [R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm.

*Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Accordingly, the Supreme Court held that "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 65. *See also Massie v. U.S. Dep't of Housing & Urban Dev.*, 620 F.3d 340, 347 (3d Cir. 2010) (reviewing an agency's actions to determine if it "failed to take a *discrete* ... action that it is *required* to take.") (quoting *Norton*, 542 U.S. at 65) (emphasis in original).

---

[2] Plaintiffs' reliance on *Hardin* is misplaced because that case did not arise under the APA. *See* Dkt. No. 5 at 19-21; *Env. Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C. Cir. 1970). *Fox Television* is also immediately distinguishable because the agency had issued a final report; here, the Secretary has not rendered any decision. *Fox Tele. Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002).

As discussed above, Plaintiffs' requested relief is neither discrete nor is the Secretary required to take such action. *See supra* § I.A.1. Instead, Plaintiffs ask the Secretary to exercise purely discretionary authority in responding to critical comments to order the OPTN set aside the heart allocation policy in a manner that would specifically benefit the Child. The APA does not authorize such relief.

**B.       Plaintiffs Have Not Shown Likelihood of Success on the Merits**

Plaintiffs cannot succeed on the merits because their requested relief is contrary to the applicable statute, regulations, and policies. Here, there is no allegation that OPTN erred in its application of the current heart allocation policy to the Child. Instead, Plaintiffs assert that the policy does not account for the medical urgency of the Child's unique circumstances, and that the Child's place in line should be reordered accordingly.

In cases of life or death, particularly given the scarcity of organs available for transplantation, each individual will likely feel that their situation is the most urgent. But Congress did not establish a process to allocate vital organs on a case-by-case basis. Instead, NOTA requires organs to be allocated "equitably" and the regulations also require the "equitable allocation of . . . organs." *See* 42 U.S.C. § 274(b)(2)(D); 42 C.F.R. § 121.4(a)(1). The HHS regulations further specify that organs "shall be offered for potential recipients in accordance with *policies developed under § 121.8 and implemented under § 121.4.*" 42 C.F.R. § 121.7(b)(1) (emphasis added).  Plaintiffs fail to identify any authority for the OPTN to grant a special exception to a single patient in violation of current OPTN policy.

16

Plaintiffs also fail to show that the current OPTN policy is contrary-to-law or arbitrary or capricious. On April 1, 2026, the OPTN explained the development and evaluation of its allocation policies to Plaintiffs:

> The OPTN continually evaluates its allocation policies to ensure they reflect our mandate to provide for the equitable distribution of organs in a manner that prioritizes medical urgency, promotes patient access to transplantation, avoids organ waste, and efficiently manages organ placement. We strive to maintain policies that fairly treat each of the many families waiting for an organ for their loved one.
>
> Developing and revising organ allocation policies is one of the OPTN's most significant responsibilities. Any policy change that adjusts the priority of one group of prospective transplant patients has potential implications for other groups of patients. For this reason, OPTN policies are developed through a specific, carefully designed process that includes public participation and the engagement of transplant physicians, patients, and donors and their families, which intends to ensure a diverse array of perspectives are taken into account. We are obligated to follow this process, which requires us to respect the input of all severely-ill patients awaiting an organ, and we are unable to modify allocation policies based on one patient's circumstances.

Compl. Ex. G [Dkt. No. 1-9].

Plaintiffs' principal critique of the current OPTN heart allocation policy is a purported failure to rank by medical urgency. Dkt. No. 5 at 1. But that is inaccurate. The current policy separates patients into three different statuses in accordance with objective criteria based on medical urgency. *See supra* Facts § II.B. Medical urgency is a critical component of qualifying for status 1A, because patients who are hospitalized tend to be more sick than patients who are not hospitalized.[3]

---

[3] Even though the use of a VAD device alternatively qualifies a patient for Status 1A, hospitalization is another basis to qualify for status 1A, including for patients who may not be indicated for a VAD device.

17

Although the policy does consider waiting time within a given status, a patient's calculated rank for each donated organ depends on numerous factors, including blood type match and distance between the transplant hospital and donor hospital. *See id.*

Moreover, the OPTN is not required to rank patients solely by medical urgency. First, patients are ordered "from most to least medically urgent" only "to the extent possible" and using "objective and measurable medical criteria." 42 C.F.R. § 121.8(b)(2). Second, OPTN allocation policies must meet numerous other regulatory requirements, including that allocation policies shall "seek to achieve the best use of donated organs" and shall be designed to "avoid futile transplants." 42 C.F.R. § 121.8. A ranking based solely on medical urgency is inconsistent with the regulatory requirement to balance eight factors, including to "avoid wasting organs" and "futile transplants," when developing allocation policies. 42 C.F.R. § 121.8(a). For example, a patient that could most urgently need a donor heart may also be the most unlikely to survive a transplant operation. Because the current OPTN policy was developed to take into account all of these considerations, there is surely a "satisfactory explanation" for the OPTN's policy and a "rational connection" between the policy and the equitable allocation of donor hearts. *See Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*, 90 F. 4th 122, 130-31 (3d Cir. 2024).

Plaintiffs' second request, which would require HHS to order the OPTN to allow the Child to retain status 1A while not being hospitalized, would unfairly prejudice other children. Currently, many pediatric patients on the waitlist who are

18

not hospitalized (including those who may be contraindicated for a VAD device) are ineligible for status 1A. Granting an exception to Plaintiff, while denying that relief to other similarly situated patients and bypassing the OPTN's standard policymaking process, conflicts with NOTA and the OPTN Final Rule's requirements for the equitable allocation of organs.

It is also unclear whether Plaintiffs even stand to benefit from a policy that weighs medical urgency more heavily. Plaintiffs lack any knowledge of other children's circumstances, and Plaintiffs' assertion that the Child's situation is more medically urgent than others is pure speculation. And even if Plaintiffs are correct that the heart allocation policy does not sufficiently weight the Child's medical urgency, Plaintiffs have not shown at this stage that the policy is unlawful or so patently unreasonable as to be considered arbitrary and capricious. *Sierra Club v. E.P.A.*, 972 F.3d 290, 298 (3d Cir. 2020) ("Even when an agency has engaged in line-drawing determinations courts review primarily to determine whether the result is patently unreasonable or run[s] counter to the evidence before the agency."). Plaintiffs' request to substitute their judgment for the unambiguous requirements of an established, reasonable policy created by medical experts should be denied. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he scope of review under the [APA] is narrow and a court is not to substitute its judgment for that of the agency").

Finally, where a plaintiff shows that an agency policy is arbitrary and capricious, the relief granted is almost always to remand to the agency. *See Fla.*

19

*Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that, "[i]f the record before the agency does not support the agency action, ... the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Coinbase v. S.E.C.*, 126 F.4th 175, 189 (3d Cir. 2025) ("When an agency fails to articulate an adequate legal basis for its action, the proper course for the regulated entity is to object in the enforcement proceeding, and the proper remedy is to dismiss the action or to vacate or remand the agency's order."). It would be improper to grant Plaintiffs a special exception to a generally applicable policy without first remanding to the agency for further investigation, particularly where doing so would disadvantage other children awaiting heart transplants.

## II.    Plaintiffs Do Not Meet the Other Factors for Injunctive Relief

First, Plaintiffs do not show that irreparable harm to the Child will occur in the absence of injunctive relief. The Child needs a heart transplant and is on the list to receive one. But Plaintiffs lack any information as to how the medical urgency of the Child's case compares to other similarly-situated children. And injunctive relief cannot ensure the immediate availability of a donor heart. Even if a donor heart were available, the hospital transplant team must deem the organ a suitable size for the patient, find the blood types to be compatible, and find no other medical contraindications. Because it is conjecture that Plaintiffs' case is more medically urgent, and speculative whether reordering the waitlist will prevent irreparable harm, Plaintiffs' cannot meet their heavy burden for a mandatory injunction. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("[W]e have also

20

insisted that the risk of irreparable harm must not be speculative.").

Second, the public interest and balance of the equities weigh strongly against the issuance of injunctive relief. Where a plaintiff seeks preliminary relief against the federal government, the last two factors—public interest and balance of the equities—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, it is undisputed and unfortunate that the Child and other children on the waiting list need heart transplants. Plaintiffs' assertion that the Child's case is "more urgent than others who are ranked higher on the waiting list" is unfounded (Compl. ¶ 54), because Plaintiffs know nothing of their medical circumstances. To the extent that Plaintiffs disagree with OPTN's heart allocation policy, they may seek appropriate relief through the critical comment process, which is currently underway and will take into account input from the OPTN's experts and the medical community. The Complaint, however, asks the Court to shortcut that process and let a single patient jump in front of other patients awaiting transplants. Although Plaintiffs' circumstances are tragic, it is wrong to value a single patient's life above the lives of other patients and upend an objective, orderly system in favor of *ad hoc* litigation advantaging those able to bring suit. The balance of the equities strongly favors Defendant. *See, e.g.*, *Astellas Pharma US, Inc. v. FDA*, 642 F. Supp. 2d 10, 24 (D.D.C. 2009) (denying injunction where the "evidence presented to the court strongly suggests" the challenged policy serves the "interests of the public, and . . . transplant patients more specifically").

## CONCLUSION

Plaintiffs have not established a likelihood of succeeding on their claims, and the public interest and balance of the equities strongly counsel against issuing an injunction. Moreover, Plaintiffs' requested relief, which requests differential treatment for a single patient, conflict with NOTA and the OPTN Final Rule's requirements for equitable allocation. Accordingly, the Plaintiffs' request for this extraordinary remedy should be denied.

Dated:  May 12, 2026                   Respectfully submitted,

                                       DAVID METCALF
                                       United States Attorney

                                       */s/ Gregory B. David*
                                       GREGORY B. DAVID
                                       Assistant United States Attorney
                                       Chief, Civil Division

                                       */s/ Eric S. Wolfish*
                                       ERIC S. WOLFISH
                                       Assistant United States Attorney
                                       Eastern District of Pennsylvania
                                       615 Chestnut Street, Suite 1250
                                       Philadelphia, PA 19106
                                       Phone:   (215) 861-8598
                                       Email:   eric.wolfish@usdoj.gov

                                       *Counsel for Defendants*

22

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 12, 2026, a true and correct copy of Defendants' foregoing Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*/s/ Eric S. Wolfish*
ERIC S. WOLFISH
