**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE and JANE DOE,** | : | |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | **CIVIL NO. 26-2937** |
| | : | |
| **ROBERT F. KENNEDY, JR.,** *in his official* | : | |
| *capacity as Secretary of the U.S. Department* | : | |
| *of Health and Human Services,* | : | |
| *Defendant.* | : | |

## MEMORANDUM

**KENNEY, J.**                                                                **MAY 20, 2026**

This case arises from an area that is seldom explored by the judiciary: administrative regulations and policies regarding how human organs are allocated to patients in dire need of a transplant. Plaintiffs' 7-year-old child ("Child Doe") suffers from end-stage heart disease and kidney failure and needs both a heart and kidney transplant. *See* ECF No. 1 ¶ 1. On May 3, 2026, Plaintiffs filed a Motion for Immediate and Preliminary Injunctive Relief (the "Plaintiffs' Motion") in connection with Child Doe's place on the waitlist for pediatric heart transplants, which is maintained by the Organ Procurement and Transplantation Network ("OPTN"). *See* ECF No. 5. Specifically, Plaintiffs request that the Court order Defendant Robert F. Kennedy, Jr., the Secretary of the U.S. Department of Health and Human Services ("HHS"), "to direct the OPTN" (1) to reorder Child Doe's place on the waitlist for pediatric hearts "to reflect the medical urgency of her situation in relation to other patients who need a heart transplant," and (2) to allow her "to be housed outside of the hospital without losing" her designated status on the waitlist. ECF No. 5-1 at 25; *see also* ECF No. 5-2 at 7. Defendant opposes Plaintiffs' Motion. *See* ECF No. 16.

The Court acknowledges the heartfelt and compelling circumstances that counsel has drawn to its attention. The Court also understands a parent's desire to pursue and engage all

resources in an attempt to assist a severely ill child.  However, in this instance, Plaintiffs are asking the Court to place its thumb on the scales of justice in a context in which countless doctors, experts, transplant patients, members of the public, and other interested parties have weighed in.  The result of that deliberative administrative process is a system that allocates a resource for which demand nearly always exceeds supply.  With that context in mind, there are several jurisdictional hurdles Plaintiffs have failed to clear that ultimately preclude this Court from ordering the emergency relief that Plaintiffs seek.  For the reasons set forth below, the Court will **DENY** Plaintiffs' Motion (ECF No. 5), and decline to enter either a temporary restraining order or a preliminary injunction.

## I.    BACKGROUND

### A.  Statutory and Regulatory Framework

At the outset, a word is warranted on the governing statutory and regulatory provisions that are threaded throughout Plaintiffs' Motion and Complaint.  "In the United States, organ transplants are a public-private affair." *Callahan v. U.S. Dep't of Health & Hum. Servs., through Alex M. Azar II*, 939 F.3d 1251, 1254 (11th Cir. 2019).  Through the National Organ Transplant Act of 1984 ("NOTA"), Congress set forth a framework for coordinating a national system for organ procurement and transplantation.  *See* 42 U.S.C. § 273 *et seq.*  The NOTA requires the Secretary of HHS to oversee the operation of the OPTN, which is a "private, not-for-profit entity," *see* 42 C.F.R. § 121.3(c)(1), that has a Board of Directors composed of "representatives of organ procurement organizations . . ., transplant centers, voluntary health associations, and the general public." *Id.* § 274(a), (b)(1)(B)(i); *see also* 42 C.F.R. § 121.3(a) (describing the composition of the Board of Directors of the OPTN).  Members of the OPTN include transplant hospitals, organ procurement organizations, and "[o]ther organizations, institutions, and individuals that have an interest in the fields of organ donation or transplantation." *Id.* § 121.3(b)(1)(i)–(iii).

Under the NOTA, the OPTN must maintain both "a national list of individuals who need organs[,]" and "a national system, through the use of computers and in accordance with established medical criteria, to match organs and individuals included in the list."    42 U.S.C. § 274(b)(2)(A)(i)–(ii).   Among several other enumerated duties, the OPTN must also "establish membership criteria and medical criteria for allocating organs and provide to members of the public an opportunity to comment with respect to such criteria[,]" and "assist organ procurement organizations in the nationwide distribution of organs equitably among transplant patients."  *Id.* § 274(b)(2)(B), (D); *see also Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 17 F.4th 793, 796–97 (8th Cir. 2021) (discussing the OPTN's role and explaining that allocating organs is "an incredibly complex effort").  In addition, the Secretary of HHS is required to "establish procedures" that account for "(1) receiving from interested persons critical comments relating to the manner in which the Organ Procurement and Transplantation Network is carrying out the duties of the Network . . . and (2) the consideration by the Secretary of such critical comments."  42 U.S.C. § 274(c).

Consistent with this statutory directive, HHS promulgated a final rule that became effective on March 16, 2000, which details the Secretary's and the OPTN's roles and responsibilities with respect to organ transplants (the "Final Rule").  *See* Organ Procurement and Transplantation Network, 63 Fed. Reg. 16,296 (Apr. 2, 1998); Organ Procurement and Transplantation Network; Response to Comment Period, 65 Fed. Reg. 15,252 (Mar. 22, 2000); *see also* 42 C.F.R. pt. 121. While the NOTA "describes the OPTN's duties in broad strokes, HHS's implementing regulation . . . covers the nitty-gritty."  *Callahan*, 939 F.3d at 1254.  As relevant to Plaintiffs' Motion, the Board of Directors of the OPTN is "responsible for developing, with the advice of the OPTN membership and other interested parties, . . . [p]olicies for the equitable allocation of cadaveric

3

organs in accordance with § 121.8." 42 C.F.R. § 121.4(a)(1). Section 121.8, in turn, provides that the Board of Directors "shall develop, in accordance with the policy development process described in § 121.4, policies for the equitable allocation of cadaveric organs among potential recipients." *Id.* § 121.8(a). When developing allocation policies, the OPTN must "base[] [them] on sound medical judgment[,]" "seek to achieve the best use of donated organs[,]" and "avoid wasting organs," among other enumerated considerations. *Id.* § 121.8(a)(1)–(2), (5). Allocation policies must "be designed to achieve equitable allocation of organs" through certain performance goals, including "[s]etting priority rankings expressed, to the extent possible, through objective and measurable medical criteria." *Id.* § 121.8(b)(2). Those "rankings shall be ordered most to least medically urgent[,]" and there also must "be a sufficient number of categories (if categories are used) to avoid grouping together patients with substantially different medical urgency." *Id.* The Secretary of HHS is tasked with reviewing the OPTN's "proposed allocation policies and performance indicators." *Id.* § 121.8(f).

Following the promulgation of HHS's Final Rule, the OPTN crafted a comprehensive set of policies regarding the allocation of pediatric hearts. *See* ECF No. 16-1. As relevant here, Policy 6.2.A specifies the criteria that a pediatric heart transplant candidate must meet before that individual can be assigned to Status 1A, which is the most urgent status. *See* ECF No. 16-1 at 125. Policy 6.6.C provides that "[c]andidates are sorted within each classification by the total amount of waiting time that the candidate has accumulated at that status[.]" *Id.* at 132. Under Policy 6.5, "[w]aiting time for heart candidates begins when the candidate is first registered as an active heart candidate on the waiting list and is calculated within each heart status." *Id.* at 130.

With respect to the Secretary's oversight role over the OPTN, HHS's implementing regulation allows "[a]ny interested individual or entity" to "submit to the Secretary in writing

critical comments related to the manner in which the OPTN is carrying out its duties or Secretarial policies regarding the OPTN." 21 C.F.R. § 121.4(d).  Critical comments must "include a statement of the basis for the comments."  *Id.*  Where appropriate, the Secretary "will seek . . . the comments of the OPTN on the issues raised in the [critical] comments related to OPTN policies or practices."  *Id.*  "Policies or practices that are the subject of critical comments remain in effect during the Secretary's review, unless the Secretary directs otherwise based on possible risk to the health of patients or to public safety."  *Id.*  Moreover, the Secretary is directed to "consider the comments in light of the [NOTA] and the regulations" within part 121 of the Code of Federal Regulations.  *Id.*  In doing so, the Secretary may also "consult with the Advisory Committee on Organ Transplantation established under § 121.12."  *Id.*  After reviewing the critical comments, the Secretary is authorized to "(1) [r]eject the comments; (2) [d]irect the OPTN to revise the policies or practices consistent with the Secretary's response to the comments; or (3) [t]ake such other action as the Secretary determines appropriate."  *Id.* § 121.4(d)(1)–(3).

### B.  Factual Background

Plaintiffs are the parents of 7-year-old Child Doe, who suffers from both end-stage heart disease and kidney failure.  *See* ECF No. 1 ¶¶ 1, 28–29.  Since 2021, she has been a patient at the Children's Hospital of Philadelphia ("CHOP").  *Id.* ¶ 28.  Child Doe "needs both a transplanted heart and kidneys" to survive, but is currently in greater immediate need of a heart transplant.  *Id.* ¶ 1.  On January 7, 2026, she was admitted to CHOP after experiencing "collateral bleeding in her airway."  *Id.* ¶ 2.  She has remained hospitalized since that time, has experienced collateral bleeding on at least three other occasions, and "has gone into cardiac arrest twice."  *Id.* ¶¶ 2, 30; *see also id.* ¶ 33.  Due to her medical condition, a ventricular assist device ("VAD") is currently not a viable

alternative option for her as she awaits a heart transplant because it might "contribute to and increase the risk of collateral bleeding." *Id.* ¶ 31.

"Under the OPTN system, Child Doe is currently listed as Status 1A" for a pediatric heart transplant. *Id.* ¶ 34. "[W]ithin Status 1A, patients are ranked by wait time in Status 1A." *Id.*; *see also* ECF No. 16-1 at 132. Child Doe has been accruing wait time in Status 1A as of March 12, 2026, but is "wait[ing] an indefinite period, likely a year or more, before she receives a transplant[,]" and has not accrued significant wait time in Status 1A compared to other transplant candidates. ECF No. 1 ¶¶ 34, 40. Even though she was dealing with heart disease and kidney failure prior to her January 7, 2026 hospitalization, she was designated as Status 1B at that time because, among other criteria, transplant candidates must be admitted to the hospital or using a mechanical circulatory support device, such as a VAD, before the OPTN will designate them as Status 1A. *Id.* ¶¶ 35–38; *see also* ECF No. 16-1 at 125.

Moreover, although Child Doe has been hospitalized since January 7, 2026, she has not been designated as Status 1A for the entire period of time that she has been in the hospital. ECF No. 1 ¶ 39. She was first listed as Status 1A on January 9 after being admitted to CHOP a couple of days earlier. *Id.* On January 21, she "began coughing up blood, went into cardiac arrest, and was intubated." *Id.* The following day, she was removed from Status 1A, but later "went back on Status 1A on January 29." *Id.* After coughing up more blood on February 9 and 10, her medical team removed her from Status 1A on February 11 and intubated her for cardiac catheterization on February 26. *Id.* On February 27, Child Doe's doctors told Plaintiffs that "she would not be a candidate for a heart/kidney transplant" and should be taken home from the hospital for palliative

6

care and hospice soon. *Id.*; *see also id.* ¶ 2.[1]  However, after this conversation, Child Doe's condition improved and she was extubated on February 28. *See id.* ¶¶ 2, 40.  On March 12, she was again listed as Status 1A and has been in stable condition since that time. *See id.* ¶ 40.  Until she receives a heart transplant, she continues to be at severe risk of collateral bleeding in her airway and cardiac arrest, but her doctors are unable to predict when collateral bleeding may reoccur. *Id.* ¶¶ 2, 40.

### C.  Administrative Outreach

At the end of March 2026, Plaintiffs initiated outreach through counsel to several entities about the urgency of Child Doe's situation, her place on the transplant waitlist, and the alleged inequities of the OPTN's system for ranking transplant candidates within Status 1A.

On March 27, 2026, Plaintiffs' counsel first contacted the Chief Executive Officer of the United Network for Organ Sharing ("UNOS"). *See id.* ¶ 42; *see also* ECF No. 1-3 at 12, 38–39. The UNOS is a federal contractor to the Health Resources and Services Administration ("HRSA")[2] and provides support to the OPTN. *See id.* at 38; *see also* ECF No. 1 ¶ 42.  In his letter, counsel explained that Plaintiffs believed Child Doe "is being unfairly and incorrectly treated as less medically urgent than other patients in the organ allocation system whose need is not as dire." ECF No. 1-3 at 13.  According to counsel, Child Doe "has had little time waiting in Status 1A despite need[ing] a heart and kidneys for approximately five years[,]" and is being made to "wait longer than other patients for arbitrary reasons when the reality is that she presents as a very medically urgent case, more urgent than others who are ranked higher on the waiting list." *Id.* at

---

[1] Plaintiffs' Complaint alleges the conversation about palliative care occurred on February 19, *see* ECF No. 1 ¶ 2, but an affidavit signed by Plaintiff Jane Doe and medical records appear to indicate that this conversation occurred on February 27. *See* ECF No. 1-3 at 17, 23.

[2] HRSA is an agency within HHS. *See* 42 U.S.C. § 274c.

12–13.  Therefore, counsel asked "to receive [the CEO's] thoughts and those of experts at UNOS about this specific inequity and what could be done to address it, consistent with the overall legal and ethical mandate that organs be allocated fairly and with due regard for medical urgency."  *Id.* at 13.  Later that day, the Associate General Counsel of UNOS responded that UNOS did "not have unilateral authority to take any action" given its role as a contractor to HRSA.  *Id.* at 38; *see also* ECF No. 1 ¶ 42.  UNOS referred Plaintiffs to HRSA and Dr. John Magee, the President of the Board of Directors of the OPTN.  *See* ECF No. 1-3 at 38.

On March 28, 2026, Plaintiffs' counsel next contacted HRSA and the OPTN, raising the same concerns about the alleged inequities of the OPTN's system for allocating pediatric hearts to transplant candidates within Status 1A.  *Id.* at 37–38; *see also* ECF No. 1 ¶ 43.  On March 29, 2026, Dr. Magee told Plaintiffs' counsel that "[t]he OPTN [was] conducting an expedited review of the information provided" and would provide "a more detailed response as soon as that review [was] completed."  ECF No. 1-3 at 28, 37.  On April 1, 2026, HRSA separately acknowledged Plaintiffs' counsel's letter.  *Id.* at 33–34.  HRSA stated that it was "conferring with the OPTN" and expected that a substantive response would be sent soon regarding the issues he had raised.  *Id.* at 34.

Also on April 1, 2026, Dr. Magee sent Plaintiffs' counsel a letter on behalf of the OPTN in response to his March 27 letter.  *See* ECF No. 1-9 at 2–3.  The OPTN advised that it had "conducted an expedited review of [his] letter" and had "assessed whether, based on [his] description of [Child Doe's] circumstances, her waitlist placement is consistent with OPTN heart allocation policy for pediatric candidates."  *Id.* at 2.  In addition, the OPTN "also considered whether there may be pathways, consistent with the allocation policy, to address [Child Doe's] current placement on the waitlist that could be explored with her clinical care team."  *Id.*  Dr. Magee noted that OPTN Policy

6.2 covers "the status assignment criteria" for pediatric heart transplant candidates, and Policy 6.5 "establishes the calculation for accruing waiting time." *Id.* "Based on the information available to [the OPTN]," it concluded that "[i]t appears that [Child Doe's] current placement on the waitlist is consistent with the allocation policy." *Id.* Dr. Magee also explained that "OPTN policies are developed through a specific, carefully designed process that includes public participation and the engagement of transplant physicians, patients, and donors and their families." *Id.* at 3. As such, the OPTN was "obligated to follow this process" and was "unable to modify allocation policies based on one patient's circumstances." *Id.* In addition, Dr. Magee stated that the OPTN was available "to discuss [Child Doe's] options and status" with her "clinical care team" if they desired "to meet with OPTN personnel." *Id.*; *see also* ECF No. 1 ¶ 44.

On April 10, 2026, Plaintiffs' counsel asked if the meeting that OPTN had suggested could be scheduled. *See id.* ¶ 45; *see also* ECF No. 1-3 at 31–33. The OPTN responded a few days later that it would only meet at Child Doe's clinical care team's request, and the team at CHOP had indicated it did not need a meeting. *See id.*

On April 15, 2026, Plaintiffs' counsel wrote again to the OPTN and asked four specific questions:

- Is there any way under the existing policy that she can be credited with additional time in Status 1A, such as the time she was receiving dialysis at home before being admitted to CHOP and/or all of the time since being admitted at CHOP?

- If she gets listed at another hospital, how will that affect her time in Status 1A?

- Would it be possible for her to be outside of the hospital close to the emergency room to improve the quality of her life, which regrettably could be short, without removing her from Status 1A?

- Is there any way to gauge when she might receive a heart and kidneys under the current policy?

ECF No. 1 ¶ 45; *see also* ECF No. 1-3 at 30–31.  One week later, on April 22, the OPTN provided answers to each question that Plaintiffs' counsel had raised and referred counsel to several OPTN policies, including Policies 3.6.C, 6.2.A, and 6.5.  *See* ECF No. 1-4 at 47–48.

In addition to contacting UNOS and the OPTN about Child Doe's place on the transplant waitlist, Plaintiffs' counsel started reaching out to Defendant at the end of April.  On April 21, 2026, Plaintiffs' counsel sent Defendant a letter, requesting that he exercise his authority under 42 C.F.R. § 121.4 to address an "illegal malfunctioning" of the OPTN.  ECF No. 1-3 at 2; *see also* ECF No. 1 ¶ 46.  According to counsel, the criteria that the OPTN uses to rank patients is "incorrectly underestimating [Child Doe's] medical severity" and "treating her as less ill than she really is for purpose of organ allocation."  ECF No. 1-3 at 2–3.  After detailing Child Doe's situation, counsel explained that the OPTN's belief that her "current placement on the waitlist is consistent with" its policies did "not answer the real question, which is whether the policy is allocating organs equitably in accordance with the mandate of ranking by medical urgency to the greatest extent practicable."  *Id.* at 6.  Moreover, counsel argued that it was "arbitrary and unreasonable" for Child Doe to have to remain in the hospital "to not lose time in Status 1A" if she did not need to be hospitalized while awaiting a transplant.  *Id.* at 5–6.  Counsel also noted that Defendant has "clear authority" under 42 C.F.R. § 121.4 "to order an immediate review of this situation."  *Id.* at 8.  Furthermore, counsel requested that "any report of the review be shared with [Child Doe's] parents so they can seek judicial review, if appropriate[,]" and that Defendant's review specifically address the following topics:

> [W]hether [Child Doe's] placement on the waiting list is in accordance with a reasonable evaluation of the medical severity of her condition in relation to other patients, if not whether there is some compelling reason for not addressing the apparent failure to rank her by medical severity, and whether it would be appropriate (equitable) in accordance with the principles that govern the OPTN's policies for her to be credited with time in Status 1A during the time she was at

10

home before being hospitalized, listed as Status 1B, and undergoing dialysis on a daily basis, as well as all the time since she has been hospitalized since January 7 . . . [and] whether there is any sound reason why [Child Doe] should not be allowed to live outside of the hospital but close by (so she can return quickly in an emergency) if she can receive dialysis and care outside and her doctors determine that there is no medical reason why she needs to be in the hospital, without losing time in Status 1A.

*Id.*

On April 27, 2026, Plaintiffs' counsel sent Defendant a second letter to supplement his prior request for review under 42 C.F.R. § 121.4. *See* ECF No. 1-4 at 2–5; *see also* ECF No. 1 ¶ 49. Counsel attached a copy of the OPTN's answers to the four questions that he had emailed them and highlighted "[w]hat [was] noteworthy" about the answers. ECF No. 1-4 at 2. Furthermore, he provided additional context for his prior letter, explaining to Defendant that Child Doe "cannot be treated with a [VAD]," yet has been placed "lower on the waiting list than other pediatric patients who could wait longer than her for a heart (because they can utilize a VAD)." *Id.* at 3 (emphasis omitted). He emphasized that Plaintiffs are concerned that Child Doe "is at serious risk of dying sooner than other patients who can utilize a VAD and are higher on the waiting list for a heart." *Id.* (emphasis omitted). Therefore, counsel requested that Defendant also "determine the answer to this medical/factual question as part of [his] review" under Section 121.4. *Id.*

On April 30, 2026, Plaintiffs' counsel sent Defendant a third letter and noted that he was seeking an "expedited resolution of [Plaintiffs'] request for action by [Defendant] under 42 C.F.R. § 121.4." ECF No. 1-5 at 3. Counsel also let Defendant know that he was preparing to file a complaint in the Eastern District of Pennsylvania and would be "seeking expedited injunctive relief" under the Administrative Procedure Act ("APA"). *Id.*

On May 1, 2026, Tanya Xu, an Attorney Adviser for HHS, emailed Plaintiffs' counsel and indicated that HHS had "received [his] critical comment letters." ECF No. 1-10 at 2; *see also* ECF

11

No. 1 ¶ 51.  Ms. Xu also stated that "earlier today, HRSA, on behalf of HHS, sent . . . [a] letter to the OPTN, which seeks the OPTN's views on the issues raised by [the] critical comment letters dated March 27, April 21, and April 27, 2026."  ECF No. 1-10 at 2; *see also id.* at 3–5.  In HRSA's letter, which was addressed to Dr. Magee, an Associate Administrator explained that HHS and HRSA were "seeking a response from the OPTN on the issues raised in [Plaintiffs' counsel's] letters" in order "[t]o assist in HRSA's consideration of the critical comment[s]."  *Id.* at 3.  HRSA's letter requested the OPTN's views on eight different topics and noted that the OPTN should provide "robust justification for" its views.  *Id.* at 3–5.  For example, the OPTN was asked to provide its "views as to whether the current OPTN pediatric heart allocation policy, which ranks patients within each respective status by waiting time without regard to relative medical urgency, complies with the regulatory requirements at 42 C.F.R. § 121[.]"  *Id.* at 4.  Moreover, among other topics, the OPTN was asked to provide its "views as to whether [the] current OPTN pediatric heart allocation policy, which currently has three different statuses reflecting medical urgency (1A, 1B, and 2), complies [with] the regulatory requirements at 42 C.F.R. § 121," including the requirement that there be a sufficient amount of categories "'to avoid grouping together patients with substantially different medical urgency.'"  *Id.* (quoting 42 C.F.R. § 121.8(b)(2)).  HHS and HRSA asked Dr. Magee to provide the OPTN's responses by May 22, 2026, "[g]iven the additional time that may be required to access complete system-level data[.]"  *Id.* at 5.  The Associate Administrator would then review the OPTN's responses on behalf of Defendant.  *Id.*

Shortly after receiving Ms. Xu's email, Plaintiffs' counsel responded that he and his clients would be proceeding with filing a Complaint in federal court that day, followed by a "motion for immediate injunctive relief."  ECF No. 1-11 at 2; *see also* ECF No. 1 ¶ 51.  Counsel told Ms. Xu that they would be seeking an order "for the Secretary to immediately require the OPTN to reorder

12

the child's place in the waiting list so that she is not waiting behind other patients who are less medically urgent." ECF No. 1-11 at 2. While counsel acknowledged that "[t]he OPTN would be in the best position to advise on how to do this [reordering]," counsel suggested that Child Doe could be "credit[ed] . . . with time in Status 1A for all the time she has spent on dialysis." *Id.*

### D. Procedural History

On May 1, 2026, Plaintiffs filed a Complaint raising two causes of action under the APA. ECF No. 1 ¶¶ 52–57. First, Plaintiffs asserted a claim under 5 U.S.C. § 706(2)(A)–(D), alleging that "[t]he Secretary's decision not to require the OPTN to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant is not in accordance with law." *Id.* ¶ 54. Second, Plaintiffs asserted a claim under 5 U.S.C. § 706(2)(A), alleging that (1) "[t]he Secretary's decision not to require the OPTN to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation[;]" and (2) "[t]he Secretary's decision not to require the OPTN to permit Child Doe to be housed outside of the hospital without losing Status 1A, if deemed medically acceptable by her medical team at CHOP," were both decisions that were "arbitrary, capricious, and an abuse of discretion." *Id.* ¶¶ 56–57.

On May 3, 2026, Plaintiffs filed the instant Motion seeking the entry of a temporary restraining order and a preliminary injunction. *See* ECF No. 5-1 at 25. In their Motion, Plaintiffs argue that they are requesting "judicial review" under the APA "of [Defendant's] decision not to address the evident malfunctioning of the OPTN system." *Id.* at 4–5. Plaintiffs "seek immediate and permanent injunctive relief" that would require Defendant "to direct the OPTN" (1) "to ensure that Child Doe's place in the waiting list is reordered to reflect the medical urgency of her situation in relation to other patients who need a heart transplant[;]" and (2) "to permit Child Doe to be

housed outside of the hospital without losing Status 1A, if deemed medically acceptable by her medical team at CHOP." *Id.* at 5.  In addition to injunctive relief, Plaintiffs "seek a declaration that the OPTN policies violated the NOTA and the Final Rule to the extent that they require Child Doe to wait in line" behind other candidates "whose need for a transplanted heart is less medically urgent than hers." *Id.*

On May 12, 2026, Defendant filed an Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.  *See* ECF No. 16.  Defendant principally argues that "[t]here are three jurisdictional bars to Plaintiffs' requested relief." *Id.* at 2 (emphasis omitted).  First, Defendant asserts that his "purported failure to instruct [the] OPTN to revise [Child Doe's] status on the waiting list" falls within the category of "'agency action [that] is committed to agency discretion by law[,]'" and is thus not subject to judicial review. *Id.* at 11–12 (quoting 5 U.S.C. § 701(a)(2)).  Second, Defendant contends that Plaintiffs did not identify a final agency decision because Plaintiffs admit that HHS and HRSA are engaged in an ongoing review over the issues that were raised in the critical comment letters submitted by Plaintiffs' counsel.  *Id.* at 3, 14–16.  Third, according to Defendant, he is not required by law to take the actions that Plaintiffs have requested him to take, so a mandatory injunction is not available under Section 706(1) of the APA.  *Id.* at 3, 16–17.  In any event, Defendant argues that Plaintiffs have not satisfied the requisite factors for the issuance of a temporary restraining order or a preliminary injunction.  *Id.* at 17–22.

On May 14, 2026, Plaintiffs filed a Reply in Support of their Motion, responding to Defendant's arguments.  *See* ECF No. 17.  First, Plaintiffs contend that the relief they request "is not committed to agency discretion by law" because "neither [Defendant] nor the OPTN has the discretion to disregard the command of the NOTA for equitable organ allocation or of the Final Rule for rankings based on medical urgency." *Id.* at 7, 9.  Second, Plaintiffs argue that "[u]nder

the unique circumstances of this case," Defendant's decision not to grant them immediate relief and "to postpone action until sometime after May 22, 2026," is a final agency action. *Id.* at 13, 16. Third, according to Plaintiffs, they satisfied the requirement "to identify some discrete agency action that the agency failed to take" by means of "their claim that the OPTN has failed to rank pediatric heart patients in Status 1A by medical urgency as required by the Final Rule." *Id.* at 19. Finally, Plaintiffs contend that they have met each of the requirements for the issuance of a temporary restraining order and preliminary injunction. *Id.* at 19–28.

Plaintiffs' Motion is fully briefed and before the Court.[3]

## II.   **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 65, parties can move for the entry of a temporary restraining order or preliminary injunction. *See* Fed. R. Civ. P. 65. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In exercising their discretion to issue a preliminary injunction, district courts are instructed to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (citation omitted). The party moving for preliminary injunctive relief "must show as a prerequisite":

---

[3] "'[A]n evidentiary hearing is not always required before resolving a preliminary injunction.'" *Beberman v. U.S. Dep't of State*, 675 F. App'x 131, 135 (3d Cir. 2017) (quoting *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 324 (3d Cir. 2015)); *see also Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175–76 (3d Cir. 1990) (explaining that a hearing is not "necessary if the movant is proceeding on a legal theory which cannot be sustained, because then there could be no showing of a likelihood of success on the merits"). Here, because the claims involved in Plaintiffs' Motion can be resolved on jurisdictional and "legal grounds alone, an evidentiary hearing [is] unnecessary." *Beberman*, 675 F. App'x at 135. Furthermore, the parties generally do not dispute the underlying factual record that was presented in Plaintiffs' Motion, Complaint, and supporting documents. *See Corp. Synergies Grp., LLC v. Andrews*, 775 F. App'x 54, 60 (3d Cir. 2019) (explaining that prior to the entry or continuation of a preliminary injunction, a hearing must be held except for "when the facts are not in dispute, or when the adverse party has waived its right to a hearing" (citation omitted)).

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017), (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).  In the Third Circuit, "[t]he factors are the same for both temporary restraining orders and preliminary injunctions." *Corp. Synergies Grp., LLC*, 775 F. App'x at 58 n.5 (citing *PennMont Sec. v. Frucher*, 586 F.3d 242, 245 (3d Cir. 2009)).  Furthermore, the Third Circuit has clarified that a movant must meet the first two "gateway factors"—that is, a movant must first "demonstrate that it can win on the merits" and that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179; *see also Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) ("The first two factors are prerequisites for a movant to prevail.").  If those gateway factors have been demonstrated, then a district court "considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

In addition, when a party moves for affirmative injunctive relief, rather than preservation of the status quo—as Plaintiffs have done here—the movant bears a "particularly heavy burden, requiring [it] to show a substantial likelihood of success on the merits and that [its] right to relief [is] indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (internal quotations and citations omitted); *see also Kim v. Hanlon*, 99 F.4th 140, 155 (3d Cir. 2024) (same); *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLC*, 528 F.3d 176, 179 (3d Cir. 2008) ("[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable

16

harm in the absence of an injunction."); *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) ("[A] mandatory injunction is an extraordinary remedy that is only granted sparingly by the courts."). Furthermore, the movant's burden also "is particularly heavy[] when, as here, the preliminary injunction provides the full measure of relief sought in the underlying action." *Corp. Synergies Grp., LLC*, 775 F. App'x at 60 (internal quotations and citation omitted).

## III.    DISCUSSION

Plaintiffs seek the entry of a temporary restraining order and a preliminary injunction. *See* ECF No. 5-1 at 25. For the following reasons, the Court does not have jurisdiction to order the relief that Plaintiffs request or to reach the merits of Plaintiffs' APA claims. First, Defendant's alleged decision not to grant immediate relief is not a final agency action that lends itself to judicial review. Second, Plaintiffs did not identify a discrete action that Defendant was legally required by statute or regulation to take. Therefore, the Court will deny Plaintiffs' Motion.

### A.  Jurisdiction

It is well-established that "[f]ederal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The APA provides for judicial review of "agency action," *see* 5 U.S.C. § 702, but limits judicial review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. In addition, the APA "applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law[.]'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 701(a)(1)–(2)).

17

### 1. Final Agency Action

First, the Court must determine whether there is a "final agency action" for judicial review. 5 U.S.C. § 704. Plaintiffs argue that Defendant's "decision not to grant immediate relief . . . is sufficiently final in practical consequence" because Child Doe may pass away while Defendant, HHS, and HRSA conduct their review of Plaintiffs' critical comments. ECF No. 5-1 at 19. In other words, Plaintiffs argue that Defendant's "decision not to immediately require the OPTN to reorder the child's place in the waiting list so that she is not waiting behind other patients who are less medically urgent was, in effect, a denial of their request for emergency relief and also a 'failure to act.'" *Id.* at 18 n.5. Therefore, Plaintiffs contend that Defendant's denial of immediate relief "[a]t least for now" reflects "a definitive statement of [Defendant's] position, with concrete legal consequence" because "it means that Child Doe will be stuck in line behind others less urgent than her and face the risk of dying as a result." *Id.* at 19; *see also* ECF No. 17 at 9.

In his Opposition, Defendant argues that Plaintiffs failed to identify a final agency action that is subject to judicial review because Plaintiffs acknowledge that discussions between HHS, HRSA, and the OPTN regarding their critical comments are still ongoing. *See* ECF No. 16 at 3, 14–16. Defendant disagrees with Plaintiffs that his alleged decision not to "'grant immediate relief' constitutes final agency action" because the APA allows "agencies to conduct a decisionmaking process and render a final decision *before* a plaintiff files suit." *Id.* at 15 (quoting ECF No. 5-1 at 19). Moreover, Defendant points out that HHS and HRSA have agreed to expedite their review of Plaintiffs' critical comments, so this is not an instance of "administrative inaction that could justify short-circuiting the APA's finality requirement." *Id.* at 15–16.

In *Bennett v. Spear*, the United States Supreme Court set forth a two-part test for determining the finality of agency action. 520 U.S. at 177–78. An agency action is considered

18

final if it (1) "mark[s] the consummation of the agency's decisionmaking process"—i.e., "it must not be of a merely tentative or interlocutory nature"—and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Id.* (internal quotations and citations omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). In the Third Circuit, additional factors that may be considered when determining "whether an agency's decision is final" include, for example, (1) "whether the decision represents the agency's definitive position on the question;" (2) "whether the decision has the status of law with the expectation of immediate compliance;" (3) "whether the decision has immediate impact on the day-to-day operations of the party seeking review;" (4) "whether the decision involves a pure question of law that does not require further factual development;" and (5) "whether immediate judicial review would speed enforcement of the relevant act." *Del. Dep't of Nat. Res. & Env't Control v. U.S. Env't Prot. Agency*, 746 F. App'x 131, 134–35 (3d Cir. 2018) (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 n.7 (3d Cir. 2003)). The finality requirement serves an important function because it ensures that premature judicial intervention does not deny an "agency an opportunity to correct its own mistakes and to apply its expertise." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980). Furthermore, it avoids "piecemeal review," which "is inefficient and upon completion of the agency process might prove to have been unnecessary." *Id.*

Applying these principles to Plaintiffs' Motion, the underlying record does not support Plaintiffs' position that Defendant's alleged decision not to immediately require the OPTN to reorder the pediatric heart transplant waitlist is a "final agency action" that represents "the

19

'consummation' of [HHS's] decisionmaking process." *Bennett*, 520 U.S. at 178.[4]  To the contrary, HHS and HRSA are still in the process of conducting a review and developing the factual record, and have not issued a "definitive position" regarding Plaintiffs' critical comments.  *Del. Dep't of Nat. Res. & Env't Control*, 746 F. App'x at 134 (citation omitted).  If this Court were to step in now, it would subject HHS and HRSA to "'judicial interference [before] an administrative decision has been formalized.'"  *Id.* at 135 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967)).  Therefore, the Court lacks jurisdiction to evaluate whether Defendant's purported denial of immediate relief was arbitrary, capricious, or not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).

In coming to this conclusion, the Court carefully reviewed what Plaintiffs requested of Defendant and Defendant's interim response to those requests.  Plaintiffs titled their letters to Defendant as an "[u]rgent [r]equest to [e]xercise [a]uthority [u]nder 42 C.F.R. § 121.4."  ECF No. 1-3 at 2; ECF No. 1-4 at 2; ECF No. 1-5 at 2.  Consistent with that framing, Plaintiffs' counsel explained that he was submitting critical comments on behalf of his clients in connection with Defendant's oversight role of the OPTN and was seeking an expedited review of several issues with the OPTN's policies.  *See, e.g.*, ECF No. 1-3 at 8.  In their Motion, Plaintiffs argue that Defendant effectively "den[ied] [] their request for emergency relief."  ECF No. 5-1 at 18 n.5.  But Plaintiffs did not identify any specific place within their critical comment letters in which they actually *asked* Defendant to "immediately require the OPTN to reorder the child's place in the waiting list."  *Id.*  Rather, it is clear from the face of the critical comments that they were seeking a review of the OPTN's policies pursuant to Defendant's authority under Section 121.4.  *See, e.g.*,

---

[4] Because Plaintiffs fail to satisfy *Bennett*'s first requirement, the Court need not address the second requirement—i.e., whether Defendant's decision is one from which legal consequences will flow. *See Chemours Co. FC, LLC v. U.S. Env't Prot. Agency*, 109 F.4th 179, 184 (3d Cir. 2024).

ECF No. 1-3 at 8 (describing what "[t]he requested review" should cover); ECF No. 1-4 at 3 (requesting that Defendant "determine the answer to [a] medical/factual question as part of [his] review requested under 42 C.F.R. § 121.4"); ECF No. 1-5 at 3 (explaining that his clients were "seek[ing] expedited resolution of their request for action by you under 42 C.F.R. § 121.4").[5] Furthermore, Plaintiffs' counsel requested that "*any report of the review be shared with [Child Doe's] parents so they can seek judicial review, if appropriate*."  ECF No. 1-3 at 8 (emphasis added).

Indeed, Defendant is still in the process of doing what Plaintiffs requested on an expedited basis.  *See* ECF No. 1-10 at 2–5; *see also* ECF No. 16 at 15.  In response to Plaintiffs' critical comments, Ms. Xu told Plaintiffs that HHS and HRSA had initiated a review pursuant to Section 121.4.  *See* ECF No. 1-10 at 2–5.  As a part of that process, they sent a letter to the OPTN requesting its views on eight topics by May 22, 2026.  *Id.*  The list of topics that HHS and HRSA prepared is

---

[5] In their Reply, Plaintiffs identify emails and passages from their critical comment letters, which purportedly emphasize that Plaintiffs were seeking "immediate relief" from Defendant.  ECF No. 17 at 14–17.  The communications and letters certainly reflect the urgency of Child Doe's situation and Plaintiffs' request that the OPTN and Defendant conduct a review on an expedited basis.  But when the letters are viewed in context, the requests for expedited relief that are directed towards Defendant pertain to his authority to review critical comments pursuant to 42 C.F.R. § 121.4, and are vague as to any other requested "action."  *See, e.g.*, ECF No. 1-3 at 9 ("I implore you and the other responsible officials to act promptly."); ECF No. 1-5 at 3 ("[Plaintiffs] seek expedited resolution of their request for action by you under 42 C.F.R. § 121.4.").  In essence, Plaintiffs now attempt to recharacterize the basis for the letters with the benefit of hindsight and in an effort to fit Defendant's alleged decision not to grant immediate relief into the bucket of final agency action.  In doing so, Plaintiffs are attempting to fit a square peg in a round hole.

Regardless, even if Plaintiffs had specifically asked Defendant to direct the OPTN (1) to immediately reorder the pediatric transplant waitlist and (2) to allow Child Doe to be housed outside of the hospital without losing her designation as Status 1A, Plaintiffs do not point to any authority indicating that, during his review of critical comments, Defendant has the express statutory or regulatory power to take those actions.  Plaintiffs appear to rely on 42 C.F.R. § 121.8 as "the basis for [their] primary requested relief," *see* ECF No. 17 at 8, but that provision concerns the general development of allocation policies, performance goals, and performance indicators.

detailed, asks for "robust justification," and arguably covers more than what Plaintiffs requested. *Id.* at 3–5.[6]   The record reflects that Defendant has not yet authored a report or provided a substantive response to Plaintiffs' critical comment letters detailing HHS's views on the issues that were raised; nor has Defendant made any final determination as to whether HHS will direct the OPTN to revise its policies or take another action. *See id.* at 5 ("I will review the OPTN's response considering the requirements of NOTA and the OPTN Final Rule."). The Court understands the urgency of Child Doe's situation, but Defendant's and HHS's process has only just begun and needs to conclude before judicial review can occur under the APA. *See Del. Dep't of Nat. Res. & Env't Control*, 746 F. App'x at 135 (finding that an agency's grant of an extension of its deadline to issue a final rule was not a final agency action because the extension "merely begins a process" that would "conclude[] with a final rule"); *see also Callahan v. U.S. Dep't of Health & Hum. Servs. through Alex M. Azar II*, 434 F. Supp. 3d 1319, 1352 (N.D. Ga. 2020) (noting that there did not appear "to be any dispute" between the parties that a letter "declining to act in response to [p]laintiffs' critical comment is final agency action" because it "represented HHS's decision to '[r]eject the comment[]', the consummation of the Secretarial review process under the Final Rule" (quoting 42 C.F.R. § 121.4(d)(1)). Moreover, this does not appear to be an instance where an agency is employing a review or process to delay the issuance of a decision—to the contrary, Defendant, HHS, and HRSA are exercising their oversight role as requested by Plaintiffs and are doing so expeditiously. *Cf. Heckler v. Chaney*, 470 U.S. 821, 834 (1985) ("The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead

---

[6] For example, Plaintiffs discussed a recent study from Stanford University in their April 21 letter. *See* ECF No. 1-3 at 3. Even though Plaintiffs did not specifically ask Defendant to investigate this study, HRSA is seeking the OPTN's views on it. *See* ECF No. 1-10 at 5.

to the conclusion that courts are the most appropriate body to police this aspect of their performance.").

Plaintiffs cite to two cases which purportedly support their argument that "[t]he fact that [Defendant] intends to consider the issue further after hearing back from the OPTN on May 22 does not mean that the current decision is not final." ECF No. 5-1 at 19–20. Both cases are distinguishable from the circumstances presented by Plaintiffs' Motion.

First, Plaintiffs invoke *Environmental Defense Fund, Inc. v. Hardin*, which arose out of the Secretary of the Department of Agriculture's alleged failure to take any action on a petitioner's request for an interim suspension of the pesticide DDT. 428 F.2d 1093, 1096 (D.C. Cir. 1970). Notably, in that case, the D.C. Circuit did not analyze whether there was a final agency action. Instead, it addressed the doctrine of ripeness and evaluated when "there may be a judicial remedy for the failure of an administrative agency to act promptly, and what form that remedy may take." *Id.* at 1095. The parties' dispute was ripe in the sense that there was "[n]o subsequent action [that could] sharpen the controversy arising from a decision by the Secretary that the evidence submitted by petitioners [did] not compel suspension or cancellation of the registration of DDT." *Id.* at 1098. However, that court ultimately did not order relief beyond remand to the Secretary "either for a fresh determination on the question of suspension, or for a statement of reasons for his silent but effective refusal to suspend the registration of DDT." *Id.* at 1100. Under the statutory scheme, "[t]he suspension decision [was] committed by statute to the Secretary[,]" and the court's role was "merely to ensure that he exercises his discretion within a reasonable time, and to ensure that his decision is supported by the record." *Id.* at 1099–100. *Environmental Defense Fund, Inc.* is thus of little assistance to Plaintiffs because it emphasizes both (1) that a federal court's role is limited with respect to the types of relief that can be granted in the administrative context, and (2) that a

23

federal court needs a thorough administrative record before engaging in meaningful review of agency action. And as explained above, Defendant, HHS, and HRSA are still developing the underlying factual record in connection with their ongoing review of Plaintiffs' critical comments.

Second, Plaintiffs cite *Fox Television Stations, Inc. v. FCC*, but that case is factually inapposite. 280 F.3d 1027 (D.C. Cir. 2002). There, the D.C. Circuit addressed whether the Federal Communications Commission's ("FCC") "determination not to repeal" certain rules, "made pursuant to § 202(h) after issuing a 'Notice of Inquiry' and receiving comment," was a "final agency action subject to judicial review." 280 F.3d at 1037. The FCC had conducted a review, sought comments on specific ownership rules, reviewed the comments, voted, announced its decision, and issued a written report providing reasons as to why it was retaining rules. *Id.* at 1035–36. Even though the FCC "intend[ed] to continue considering the ownership rules[,]" the D.C. Circuit found that the written report was the FCC's "last word on whether, as of 1998, the Rules were still necessary in the public interest as the result of competition." *Id.* at 1038 (internal quotations omitted). Moreover, the decision to retain the rules could be considered a "decision not to initiate a rulemaking" and had "sufficient legal consequence." *Id.* Therefore, it was a final agency action subject to judicial review. *Id.* Here, unlike in *Fox Television Stations, Inc.*, Defendant's review is still at an early stage. Defendant, HHS, and HRSA have not, for example, received the OPTN's responses, drafted a letter or report, or taken another concrete action related to those responses and Plaintiffs' critical comments.

Moreover, in their Reply, Plaintiffs argue that "[a]s to their request for immediate relief, [Defendant's] failure to act is the exact equivalent of 'no[,]'" so his decision should be considered as final with respect to that particular request. ECF No. 17 at 16. The United States Supreme Court has rejected that interpretation of a "failure to act," which is a term of art under the APA.

24

*See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).  The *Norton* court held that an agency's "'failure to act' is not the same thing as a 'denial'"; instead, it is properly understood as "the omission of an action *without formally rejecting a request*."  *Id.* (emphasis added).  Plaintiffs' attempt to frame Defendant's failure to grant immediate relief as a formal rejection for purposes of finality is misplaced.

At bottom, Plaintiffs' Motion only serves to highlight the very problem that principles of finality and administrative exhaustion are intended to avoid: needless and piecemeal judicial review of an underdeveloped administrative record.  Plaintiffs argue that "if [Defendant] on or after May 22 decides to grant relief for Child Doe, *no harm will have been done by the Court's adjudication of the matter on an emergency interim basis*."  ECF No. 5-1 at 19 (emphasis added).  However, they also note that, "if [Defendant] decides, on or after May 22," that "Child Doe must wait in line behind other patients who are less medically urgent, *the Court can at that time decide whether those reasons change the calculus* on the Plaintiffs' likelihood of success on the merits and can discontinue immediate injunctive relief if appropriate."  *Id.* (emphasis added); *see also* ECF No. 17 at 16 ("*The Secretary may make a different decision after May 22*" (emphasis added)).  Plaintiffs thus concede that Defendant has made no final decision yet with respect to the issues they raised in their critical comment letters.  Indeed, as Plaintiffs acknowledge, Defendant may very well decide after his review that the OPTN's policies violate HHS's regulation and that, as a result, it should begin the process of revising its policies.  If that does, in fact, occur, judicial review may have been unnecessary.

Accordingly, because Defendant's alleged denial of immediate relief does not bear the hallmarks of "final agency action," the Court does not have jurisdiction to order the relief that Plaintiffs have requested or to evaluate Defendant's decision on the merits.

25

*2. Failure to Act*

Plaintiffs face a second jurisdictional hurdle with respect to the injunctive relief that they request in their Motion.   Plaintiffs also characterize Defendant's alleged "decision not to immediately require the OPTN to reorder [Child Doe's] place in the waiting list" as a "failure to act" that is judicially reviewable.  *See* ECF No. 5-1 at 18 n.5.  Plaintiffs did not specifically raise a cause of action under Section 706(1) in their Complaint, nor did they expressly invoke that provision in their Motion, but Defendant properly construes Plaintiffs' requested relief as, in substance, a request to "compel agency action" under Section 706(1).  *See* ECF No. 16 at 16–17.

The APA defines "agency action" to "include[] . . . an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*[.]"  5 U.S.C. § 551(13) (emphasis added).  Under the APA, Section 706(1) contains a mechanism for providing relief in the event that an agency fails to act: "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1); *see also Norton*, 542 U.S. at 62.

In *Norton v. Southern Utah Wilderness Alliance*, the United States Supreme Court explained that "[f]ailures to act are sometimes remediable under the APA, but not always."  *Id.* at 61.  First, the *Norton* court interpreted the term "failure to act," finding that it is "limited . . . to a *discrete* action."  *Id.* at 63.  After reviewing the applicable statutory language, the Supreme Court held that a plaintiff may proceed on a Section 706(1) claim "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Id.* at 64.  The APA's limitation to *discrete* agency action prohibits "'broad programmatic attack[s]' on agency operations," while the limitation to *required* agency action, in turn, "'rules out judicial direction of even discrete agency action that is not demanded by law.'"  *Neurological Surgery Prac. of Long Island, PLLC v. U.S. Dep't of Health & Hum. Servs.*, 145 F.4th 212, 228 (2d Cir. 2025) (quoting

*Norton*, 542 U.S. at 64–65)).  Importantly, "'[Section] 706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act.'"  *Id.* (quoting *Norton*, 542 U.S. at 64)).

With this framework in mind, this Court "review[s]" Defendant's actions "to determine if [he] 'failed to take a *discrete* . . . action that [he was] *required* to take.'"  *Massie v. U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 340, 347 (3d Cir. 2010) (quoting *Norton*, 542 U.S. at 64).  Here, Plaintiffs have not demonstrated that Defendant's "decision not to immediately require the OPTN to reorder the child's place in the waiting list" constitutes a discrete action that Defendant was required to take by statute or regulation.  ECF No. 5-1 at 18 n.5.  Other courts have found that an "[a]ction is 'legally required' if the statute provides a 'specific, unequivocal command' to an agency or 'a precise, definite act . . . about which [an official has] no discretion whatever.'"  *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 839 F.3d 1165, 1172 (D.C. Cir. 2016) (quoting *Norton*, 542 U.S. at 63).  While HHS's implementing regulation details a process by which Defendant will review critical comments, *see* 42 C.F.R. § 121.4, it does not contain any "specific, unequivocal command" that Defendant order the type of immediate relief that Plaintiffs have requested in their Motion.  *Pub. Citizen, Inc.*, 839 F.3d at 1172.  To the contrary, the regulation provides Defendant with a measure of flexibility as to how to resolve critical comments.  *See* 42 C.F.R. § 121.4(d)(1)–(3) (providing Defendant with three options after conducting a review of critical comments).  Furthermore, while the regulation seemingly authorizes Defendant to exercise his discretion as to whether to suspend the OPTN's policies while his review is ongoing, the regulation does not require him to do so and appears to cabin the circumstances under which he can exercise this particular authority.  *See id.* § 121.4(d) ("[p]olicies or practices that are the subject of critical

27

comments remain in effect during the Secretary's review, *unless the Secretary directs otherwise based on possible risk to the health of patients or to public safety*." (emphasis added)).

In their Reply, Plaintiffs argue that "the OPTN has failed to rank pediatric heart patients in Status 1A by medical urgency as required by the Final Rule." ECF No. 17 at 19. Therefore, according to Plaintiffs, they "easily satisfy" their obligation "to identify some discrete agency action that the agency failed to take" because "[t]he specific action that [the] OPTN was required to take is ranking patients by medical urgency" and there is a "legal requirement to do so." *Id.* But this contention presupposes two points. First, it presupposes that the OPTN—a non-party, "private, not-for-profit entity[,]" *see* 42 C.F.R. § 121.3(c)(1)—is an "agency" within the meaning of the APA.[7] Second, it presupposes that the ranking of transplant candidates was done without regard to medical urgency, and there is, as of yet, no record to establish that finding. In addition, this is not a situation in which a discrete act will resolve the urgent situation. In other words, what is required to put in place the relief that Plaintiffs request in their Motion is a plethora of complex acts and decisions requiring a reordering of the entire waitlist, which would have both intended and unintended consequences for all the other seriously ill children on the waitlist. Furthermore, Plaintiffs do not identify any discrete action that *Defendant himself* was legally required to but failed to take, which is a fatal flaw. *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) ("[W]here an agency is *not required* to do something, we cannot compel the agency to act—let alone to act faster."). Instead, Plaintiffs lodge a challenge to "the malfunctioning of the OPTN system," *see* ECF No. 17 at 13, which is more akin to a "broad programmatic attack" that is not

---

[7] Because neither party has addressed the issue of whether the OPTN is an "agency" as that term is defined in the APA, *see* 5 U.S.C. § 701(b)(1); *id.* § 551(1), the Court does not reach the issue here, but notes that at least one other district court has determined that "the OPTN is not an agency for the purpose of the [APA]." *Callahan*, 434 F. Supp. 3d at 1352.

reviewable under the APA.  *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2021) (citation omitted).

As the Second Circuit recently reiterated, "the principal purpose of limiting APA claims to discrete agency actions that agencies are required to take 'is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.'"  *Neurological Surgery Prac. of Long Island, PLLC*, 145 F.4th at 229 (quoting *Norton*, 542 U.S. at 66); *see also City of New York*, 913 F.3d at 432 (explaining that "the limitations imposed on claims to compel agency action under the APA" result in "a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management").  That guidance is especially pertinent within this highly specialized, medical context that requires balancing many considerations when developing policies for the allocation of organs.  *Cf. Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 67 F.4th 1093, 1109 (10th Cir. 2023) ("Statutory schemes that instruct agencies to perform delicate balancing acts between competing policy goals rarely provide the kind of discrete, legally required action that can ground an APA failure-to-act claim.").

Here, the APA simply does not authorize the Court to compel the relief that Plaintiffs seek in the absence of an enumerated statutory or regulatory provision that leaves Defendant with no discretion as to whether to take the particular actions that Plaintiffs request that he take.  *See Neurological Surgery Prac. of Long Island, PLLC*, 145 F.4th at 229–30 (affirming dismissal of a Section 706(1) claim where a plaintiff could not "identif[y] a discrete action that the [agencies] failed to take" under the relevant statute); *see also Gonzalez*, 985 F.3d at 371 (finding that an

29

agency's "failure to adjudicate [p]laintiffs' requests in a timely manner [was] unreviewable" under the APA because "the agency [was] not required to implement or adjudicate pre-waiting-list work authorizations"). For this reason, too, Defendant's alleged failure to grant Plaintiffs immediate relief is not subject to judicial review under the APA.

\* \* \*

Accordingly, there are at least two jurisdictional hurdles that prevent the Court from reaching the merits of Plaintiffs' APA claims and ordering the relief that Plaintiffs seek, so the Court will deny Plaintiffs' Motion. *See, e.g.*, *PennMont Sec.*, 586 F.3d at 245 (finding that where there is no jurisdiction, a district court should not address the merits of a party's claims).[8]

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion (ECF No. 5), and decline to enter a temporary restraining order or a preliminary injunction. An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**

---

[8] In his Opposition, Defendant raised a third threshold jurisdictional issue: whether his alleged "decision not to grant Plaintiffs immediate relief," *see* ECF No. 5-1 at 19, is an "'agency action [that] is committed to agency discretion by law.'" ECF No. 16 at 11 (quoting 5 U.S.C. § 701(a)(2)). Defendant contends that his "purported failure to instruct [the] OPTN to revise" Child Doe's place on the waitlist is a decision that "falls squarely within § 701(a)(2)'s carve-out for discretionary action." *Id.* at 11–12. The Court need not reach this argument at this time given that its review is precluded on other bases.